**07 C 7180**

JUDGE MORAN
MAGISTRATE JUDGE BROWN

# EXHIBIT A

2120 - Served
2220 - Not Served
2320 - Served By Mail
2420 - Served By Publication
**SUMMONS**

2221 - Not Served
2321 - Served By Mail
2421 - Served By Publication
**ALIAS - SUMMONS**

CCG N001-75M-2/28/05 (43489658)

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, ___CHANCERY___ DIVISION

(Name all parties)

Lou Ann Maes, M.D.

v.

Robert Folberg, M.D., Board of Trustees
of University of Illinois

}

No. _____

07CH34041

### SUMMONS

To each Defendant: Robert Folberg, 820 S. Wood, 110 CSN, Chicago, Il 60612

YOU ARE SUMMONED and required to file an answer to the complaint in this case, a copy of which is hereto attached, or otherwise file your appearance, and pay the required fee, in the Office of the Clerk of this Court at the following location:

- ☐ **Richard J. Daley Center, 50 W. Washington, Room** ____, Chicago, Illinois 60602

- ☐ **District 2 - Skokie**
  5600 Old Orchard Rd.
  Skokie, IL 60077

- ☐ **District 3 - Rolling Meadows**
  2121 Euclid
  Rolling Meadows, IL 60008

- ☐ **District 4 - Maywood**
  1500 Maybrook Ave.
  Maywood, IL 60153

- ☐ **District 5 - Bridgeview**
  10220 S. 76th Ave.
  Bridgeview, IL 60455

- ☐ **District 6 - Markham**
  16501 S. Kedzie Pkwy.
  Markham, IL 60426

- ☐ **Child Support**
  28 North Clark St., Room 200
  Chicago, Illinois 60602

You must file within 30 days after service of this Summons, not counting the day of service.
**IF YOU FAIL TO DO SO, A JUDGMENT BY DEFAULT MAY BE ENTERED AGAINST YOU FOR THE RELIEF REQUESTED IN THE COMPLAINT.**

To the officer:

This Summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this Summons shall be returned so endorsed. This Summons may not be served later than 30 days after its date.

| | |
|---|---|
| Atty. No.: 50191 | WITNESS, NOV 2 0 2007 |
| Name: Steven Saltzman | DOROTHY BROWN |
| Atty. for: Plaintiff | CLERK OF CIRCUIT COURT |
| Address: 122 S. Michigan, Ste. 1850 | Clerk of Court |
| City/State/Zip: Chicago, Illinois 60603 | Date of service: 12/4/07 |
| Telephone: (312) 427-4500 | (To be inserted by officer on copy left with defendant or other person) |

Service by Facsimile Transmission will be accepted at: _____

(Area Code)    (Facsimile Telephone Number)

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
### COUNTY DEPARTMENT /CHANCERY DIVISION

Lou Ann Maes
A
                                        **Plaintiff**

              v.                                    }     Case No. _____

Robert Folberg, Board of Trustees of
University of Illinois
                                        **Defendant**

## CHANCERY DIVISION CIVIL COVER SHEET

A Chancery Division Civil Cover Sheet shall be filed with the initial complaint in all actions filed in the Chancery Division.  The information contained herein is for Administrative purposes only and shall not be introduced into evidence.  Please check the box in front of the appropriate category which best characterizes your action being filed.

| | | |
|---|---|---|
| 005 | _____ | **Administrative Review** |
| 006 | _____ | **Change of Name** |
| 001 | _____ | **Class Action** |
| 002 | _____ | **Declaratory Judgment** |
| 004 | _x_ | **Injunction** |
| 008 | _____ | **Mechanic's Lien** |
| 003 | _____ | **Mortgage Foreclosure** |
| 007 | _____ | **General Chancery** |

| | | | |
|---|---|---|---|
| _____ | **Accounting** | _____ | **Partition** |
| _____ | **Arbitration Awards** | _____ | **Quiet Title** |
| _____ | **Certiorari** | _____ | **Quo Warranto** |
| _____ | **Dissolution of Corporation** | _____ | **Redemption Rights** |
| _____ | **Dissolution of Partnership** | _____ | **Reformation of a Contract** |
| _____ | **Equitable Lien** | _____ | **Rescission of a Contract** |
| _____ | **Interpleader** | _____ | **Specific Performance** |
| _____ | **Mandamus** | _____ | **Trust Construction** |
| _____ | **Ne Exeat** | _____ | **Other** _____ |

**By:** _____
                   **Attorney**                          **Pro Se**

Atty. No.: _50191_

Name: _Steven Saltzman_

Atty. for: _Plaintiff_

Address: _122 S. Michigan, Ste. 1850_

City/State/Zip: _Chicago, Illinois 60603_

Telephone: _(312) 427-4500_

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, CHANCERY DIVISION

Attorney No. 50191

LOU ANN MAES,                )
                             )
        Plaintiff,           )    No. 07CH34041
                             )
        v.                   )    Calendar
                             )
ROBERT FOLBERG,              )    JURY TRIAL REQUESTED
and BOARD OF TRUSTEES OF     )
UNIVERSITY OF ILLINOIS       )
                             )
        Defendants.          )

## COMPLAINT FOR MANDATORY AND PROHIBITORY INJUNCTION AND FOR ACTUAL, COMPENSATORY AND PUNITIVE DAMAGES

I.    Introduction

1.    This is an action brought to correct serious violations of state and

federal law.  As remedies, Plaintiff seeks mandatory and prohibitory injunctive

relief as well as actual damages, compensatory damages and punitive

damages in an amount greater than the jurisdictional minimum of the Law

Division.  Four of the counts are a refiling of counts from a federal lawsuit

involving the same parties (06 C 6849) in which three federal counts were

dismissed on November 19, 2007 without prejudice (see Counts IV, V and VII

below) pursuant to Fed.R.Civ.P. 41(a)(2) and one count under Illinois law was

dismissed on November 19, 2007 for lack of subject matter jurisdiction due to

sovereign immunity (see Count I below) because the waiver of sovereign

immunity contained in 745 ILCS §5/1 did not specifically provide waiver for

lawsuits brought in federal court as opposed to Illinois courts.

2.    The claims in this action are brought pursuant to a) the Illinois State Officials and Employees Ethics Act, 5 ILCS §430/15-5 *et seq* to redress violations of the whistleblower provisions of that Act which protects state employees from retaliation after they have reported violations of law or regulations or are providing information or participating in an investigation against both Defendants Folberg and Board of Trustees; b) common law claim for tortious interference with economic opportunity against Defendant Folberg in his personal capacity only; c) common law claim of defamation against Defendant Folberg in his personal capacity only; d) federal law claim pursuant to the Family and Medical Act ("FMLA"), 29 U.S.C. §2611 *et seq* to redress adverse employment decisions by Defendants after Plaintiff returned from an approved medical leave; 5) 42 U.S.C. §1983 to redress violations of the First Amendment by those acting under color of law brought against Defendant Folberg in his personal capacity except for prospective prohibitory injunctive relief (including, but not limited to, reinstatement) sought against Defendant Folberg in his official capacity; 6) 42 U.S.C. §1983 to redress due process violations of the Fourteenth Amendment by those acting under color of law to Dr. Maes' reputation and employment opportunities (stigma plus) brought against Defendant Folberg in his personal capacity and in his official capacity for prospective injunctive relief; and 7) 42 U.S.C. §1983 to redress violations of the Fourth Amendment regarding the seizure of Dr. Maes computer on June 5, 2006

2

brought against Defendant Folberg in his personal capacity only.

3.      Much of the focus in this lawsuit concerns allegations that Defendants have engaged in a pattern of behavior to punish Plaintiff for reporting violations of federal law and regulations to the FDA and participating in the FDA's investigation which included attempts to correct violations of federal law and regulations in the University of Illinois at Chicago Medical Center's Blood Bank, which included violations that impacted patient care and safety.

4.      Plaintiff seeks mandatory and prohibitory injunctive relief including, but not limited to, reinstatement to her prior positions, injunctive relief to require Defendants to cease and desist from abusive, unlawful treatment of whistleblowers by top officials at the University of Illinois at Chicago Medical Center ("UIC Medical Center"); and damages, including, but not limited to, backpay, an award of compensatory damages, other make whole and statutory relief, against one or both Defendants depending on the claims and punitive damages against Defendant Folberg only.

II.    Jurisdiction and Venue.

5.      This Court has jurisdiction of the Illinois State Officials and Employees Ethics Act whistleblower violations pursuant to 745 ILCS §5/1; over the tortuous interference with economic opportunity and defamation claims pursuant to the Illinois Supreme Court's decisions in *Jinkins v. Lee*, 209 III.2d 320 (2004) and *Fritz v. Johnson*, 209 III.2d 302 (2004); over the FMLA claim pursuant to 29 U.S.C.

3

§2617(a)(2) and 745 ILCS §5/1.5 and over the three 42 U.S.C. §1983 claims (First Amendment, Fourth Amendment and Fourteenth Amendment substantive due process provisions) due to its power as a court of general jurisdiction.

6.      Venue is appropriate in this Court pursuant to 735 ILCS §5/2-103 (a) because the unlawful employment and constitutional practices and acts alleged herein were committed within Cook County, Illinois.

III. Parties

7.      Plaintiff Lou Ann (Lanne) Maes ("Dr. Maes") is a licensed physician and a  citizen of the United States and a resident of the State of Illinois and Lake County, Illinois.  Dr. Maes has been certified by the American Board of Pathology in Clinical Pathology and Transfusion Medicine.  She came to the UIC Medical Center as Visiting Director of Clinical Pathology in April, 2004.  In February-March, 2005, she became Director of Transfusion Medicine and Interim Director of Clinical Microbiology. In August, 2005, she became Director of Clinical Pathology following her promotion to Associate Professor in the College of Medicine.  She retained the positions of Director of Clinical Pathology and Director of Transfusion Medicine until Defendant Robert Folberg with the assistance of other employees of Defendant Board of Trustees began retaliating against her in October, 2005 for having made disclosures regarding violations of FDA regulations that adversely affect patient care and standards applicable to Blood Bank and Donor Room and participating in investigations to attempt to

4

correct those violations. At the present time, she remains an associate professor in the UIC College of Medicine.

8.    Defendant Robert Folberg ("Defendant Folberg") is a licensed physician who is certified in anatomic pathology and ophthalmology.  He has been the chair of the Pathology Department at the UIC Medical Center and a Professor in the College of Medicine since 2000.  At all times relevant hereto, Dr. Folberg was Dr. Maes' supervisor and empowered to remove her from her positions in the Pathology Department at the UIC Medical Center.  At all times relevant hereto, Dr. Folberg had ultimate supervisory authority over the Blood Bank and other clinical laboratories at the UIC Medical Center.   He is sued in his personal capacity for all causes of action and, pursuant to 745 ILCS §§5/1 and 1.5, in his official capacity for Counts I and IV.

9.    Defendant Board of Trustees of the University of Illinois ("Defendant Trustees") is a body politic and corporate pursuant to 110 ILCS §305/1, which operating under additional statutory provisions pursuant to 110 ILCS §305/1, has the ultimate responsibility to operate and administer the University of Illinois, including the University of Illinois College of Medicine and the University of Illinois at Chicago ("UIC") Medical Center .  Defendant Trustees are sued in their official capacity for violations of the 5 ILCS 430/15-5 et seq. (Count I) and violations of the FMLA (Count IV) pursuant to 745 ILCS §§5/1 and 1.5.

5

IV.    Common Statement of Facts

10.    The UIC Illinois Medical Center is a teaching hospital that is affiliated with the College of Medicine at UIC.  Both the Medical Center and the College of Medicine as a matter of state law are ultimately directed and controlled by Defendant Trustees.  However, Defendant Trustees, through the lack of day to day involvement and development and implementation of a real system of oversight, have ceded their responsibility to ensure patient safety and quality care of patients and to protect whistleblowers and those employees who exercise their First Amendment rights to call attention to wrongdoing to Chief Medical Officer William Chamberlin (also Associate Dean of the College of Medicine), Dr. Joseph Flaherty, Dean of the College of Medicine and the hospital administrator, John DeNardo, CEO of Heathcare Systems.

11.    In order to be certified to provide health care and to offer certain medical treatments, the UIC Medical Center must submit to various inspections and maintain accreditations or certifications from various governmental and quasi-governmental agencies, including the Food and Drug Administration ("FDA"), a federal agency, the Joint Commission on Accreditation of Healthcare Organizations ("JCAHO"), the College of American Pathologists ("CAP") and the American Association of Blood Banks ("AABB").

12.    Among the responsibilities of the Director of Transfusion Medicine and indirectly,  the Director of Clinical Pathology and the Chair of the Pathology

6

Department are to ensure the safe and effective operation of the UIC Medical

Center Blood Bank, which is comprised of the Hospital Blood Bank, the Blood

Bank Donor Room ("BBDR") and the Blood Bank Hemotherapy Center ("BBHC").

The principal duty of the BBDR is the safe collection of whole blood and blood

components (e.g. platelets, white or red cells) from donors.

13.    The principal functions of the UIC Medical Center Blood Bank are

the  safe storage of blood products that have been collected from donors,

accurate labeling and processing of blood products that have been collected,

testing of blood products to assure that they may be provided to patients in

need so that the patients receive safe and appropriate medical care and are

not harmed by being given blood products that have not been properly

collected, processed, stored or tested.

14.    The principal functions of the BBHC at the UIC Medical Center

involve the use of blood and blood products for treatment of ill patients through

transfusion of donor blood products, referred to as therapeutic apheresis, to

replace diseased blood or blood products (e.g. replacing sickled red cells with

healthy ones) and less often providing essential blood components that  the

patient lacks.

15.    BBDR collections, the Blood Bank testing and storage operations

and the functioning of the BBHC are intensively regulated by the FDA and

JACHO and monitored by the AABB and CAP to ensure safe patient care and

the prevention of harm to donors and potential recipients of the blood products collected. Such regulation requires a comprehensive process of documentation and development of procedures and monitoring, including, but not limited to, the development of training regimens, standard operating procedures (SOP's), regimens for equipment, laboratory, environmental, processing and blood product quality control, protocols for screening donors, collecting and testing blood, storage and notification to donors and recipients of positive infectious disease test results or other issues affecting patient safety.

16.    Prior to becoming employed at the UIC Medical Center, Dr. Maes had been on the faculty at the University of Arkansas for Medical Sciences and the Medical University of South Carolina. She had prior positions as the Director of Clinical Laboratory medical Student and Resident Training , Assistant Medical Director, Clinical Laboratories and Medical Director, Transfusion Medicine at the Medical University of South Carolina. She also was the Medical Director, Transfusion Medicine, Hematology and Chemistry, and Medical Director, Apheresis and Stem Cell Transplant at the Arkansas Children's Hospital. She also was Medical Director, Clinical Microbiology at the Arkansas University Hospital.

17.    From April 1, 2005 until June 5, 2006 Dr. Maes was the Director of Transfusion Medicine at the UIC Medical Center. She remained the Director of Clinical Pathology until the latter part of November, 2005, when she was forced to resign by Defendant Folberg.

8

18.    Until October, 2005, Dr. Maes encountered no adverse treatment as either a director at UIC Medical Center or a faculty member at the College of Medicine.  In fact, she was highly regarded as a teacher (in both the Colleges of Medicine and Dentistry), doctor and colleague.  On May 18, 2005, UIC Medical Center Chief Medical Officer Dr. Chamberlin, wrote to Defendant Folberg about how "brilliant" she was in convincing the Urologists to develop a regimen of competency training.  He congratulated Defendant Folberg on "a fine choice for Director of Clinical Labs." [Email from Dr. Chamberlin to Defendant Folberg, attached hereto as Exhibit A].  On May 22, 2005, Defendant Folberg informed Dr. Maes that he was completing his portion of her promotion materials that would cause her to be made an Associate Professor at the College of Medicine in a tenure track position.  That promotion was made effective in August, 2005.

19.    In late July, 2005, an employee of the Blood Donor Center submitted an email resignation in which she made misconduct allegations against the Associate Director of the Blood Bank and the BBHC, Steven Sosler and also asserted that there had been serious problems in the operation of the Blood Bank until Dr. Maes had taken over, including the allegation that SOP's the employee written had been ignored, the Blood Bank was backward in its implementation of certain procedures, products were being transfused in an improper manner and various documents were falsified in preparation for inspections by one or more of the governmental or quasi-governmental entities

listed above.

20.    Dr. Maes immediately began to investigate the employee's allegations and learned about the following violations of FDA regulations contained in 21 C.F.R. Parts 211 and 606:

a.    Platelet donor procedure files had been falsified by the previous Director of Transfusion Medicine and other doctors and that Sosler allegedly had aided in the falsification of these records, which created a risk of harm to the donor in future donations and an unsafe product that could be given to recipients;

b.    Quality control was not being consistently performed for several key tests and existing quality control records for instruments, tests, reagents and temperature readings had been either altered or falsified, which could result in false data on donors and risk that blood products used to treat patients were not safe; and

c.    New BBHC employees were not given training prior to assuming duties and competency evaluations were not administered to existing employees.

21.    Dr. Maes immediately took action through appropriate channels to cause the Blood Donor Center to be closed that same day until the Center's procedures could be assessed and a determination made about these assertions.  Within the next few days, Donor Room employees confirmed the validity of these assertions.

22.    Dr. Maes conducted an intensive investigation of the UIC BBDR from July 26 to September 1, 2005 and uncovered a number of additional violations of federal FDA regulations, including violations of 21 C.F.R.  Part 1271in that:

10

a.  Blood donor records lacked required information or the information was altered or filled in after the donation and indeed after the product had been transfused and such records, when accurate, often indicated that donations from a particular donor should have been deferred due to medical history, testing results or lack thereof, travel history, no record of consent for the donation; the records lacked important requirements for authorization to donate or a means of recognizing and resolving conflicting information; and the records did not contain the identity of the person who performed donor screening, all of which put into jeopardy the safety of the blood supply being collected;

b.  Blood collection was improper in that the donor was not being properly identified; donor blood was collected into improperly labeled tubes and collection bags and labels were not appropriately affixed to the donor file so that when testing for infectious diseases and for Rh is conducted, it can be traced to the specific donor and the product that was donated and when positive results are obtained, the donor can be notified;

c.  Certification of cardiopulmonary resuscitation ("CPR") for Donor room employees was missing, which raised a concern about the preparedness of such employees in the event of a CPR emergency;

d.  Required FDA physician reviews of the platelet and stem cell donor files was missing, which could put the donor at risk in future donations and also create a risk that an unsafe product had been donated; and

e.  Documentation was missing that donors had been notified promptly if a donation was deferred due to positive infectious disease testing and that recipients had been notified of having received a potentially unsafe product.

23.    During the investigation, Dr. Maes also uncovered violations of

federal Medicaid/Medicare regulations, which she communicated to

Defendant Folberg along with the FDA violations described above.   These

11

violations concerned falsifications of records and a large number of missing records regarding the treatment of patients by doctors in the Transfusion Medicine Service. Despite the inadequate and/or missing records, physician services had been billed to Medicare/Medicaid and other health care insurers.

24.    During the time period of her investigation, she began a process of identifying and correcting these violations but Sosler resisted making the necessary changes.

25.    On or about September 1, 2005, Dr. Maes notified the FDA of the results of her investigation to date and that she had voluntarily closed the BBDR.

26.    On or about September 21, 2005, the FDA began a routine inspection of the UIC Blood Bank, the BBDR and the BBHC. Although at first the FDA personnel said that they anticipated that the inspection would last a few days, once they were informed that Dr. Maes had already self-reported serious violations to the central headquarters of the FDA, the investigators decided to conduct a more extensive investigation that continued into the first week of October. During this inspection, FDA inspectors also noted that temperature logs were not completed satisfactorily, the centrifuge was dirty, certain documentation was kept inconsistently, improper maintenance records and other improper record-keeping and problems in the content of various SOP's.

27.    FDA inspectors did not close the Blood Bank, the BBDR and BBHC because Dr. Maes had self-reported violations and they were confident in her

ability and dedication to correcting violations and ensuring that they would not re-occur. During the course of her participation with FDA inspectors in the inspection to identify and determine how to correct the violations with the FDA inspectors during the period of the inspection, Dr. Maes voiced concerns about the Sosler's role in the above-described deficiencies and questioned his ability and commitment to operate these entities in a lawful and medically safe manner.

28.     On or about October 26, 2005, Dr. Maes attended an FDA Summation Meeting with Defendant Folberg and others. At the meeting, Defendant Folberg interrogated her about her communications with the FDA, specifically about her comments about Sosler and ordered her not to have further communications with the FDA without his approval. On several occasions after that, he reiterated that she was not allowed to contact an outside agency without his approval.

29.     On or about November 2, 2005 at an FDA Follow-up meeting, Defendant Folberg berated Dr. Maes about her "behavior" with the FDA and indicated he wanted her to resign as Director of Clinical Pathology. Dr. Maes resisted in the face of continued and strident demands by Defendant Folberg.

30.     Dr. Maes continued to take action to correct the problems with the Blood Bank, the BBDR and BBHC but was confronted with the failures of Defendant Folberg to allow needed staff to be hired and the unwillingness of

Sosler to participate in the needed changes.  On or about November 21, 2005 as part of a continuing course of action to remove Dr. Maes from her position as Director of Clinical Pathology, Defendant Folberg called her at home and insisted that she resign as Director of Clinical Pathology.  Feeling that she had no choice and under great pressure from Defendant Folberg, she wrote a resignation email to him, using language he had instructed her to use.  He immediately communicated her resignation to the staff.

31.    Dr. Maes notified Dean Flaherty about her forced resignation and complained to the UIC Office of Access and Equity, claiming that she had been retaliated against for making complaints about violations of FDA and Medicaid/Medicare regulations.  Access and Equity is  an office that is supposed to assist whistleblowers and victims of discrimination at UIC.  However, it does not do so except in a perfunctory manner.  At times, it acts to assist those at UIC who retaliate against whistleblowers and persons who have alleged discrimination.

32.    At a mediation set up by Office and Equity, Defendant Folberg was allowed to engage in verbal attacks against Dr. Maes.  She indicated that she had continued to confer with the FDA about the issues concerning violations of federal regulations and the problems she was encountering in trying to remedy them.  He refused to return her to her position in that mediation or at any other time.  He also  reiterated that she should not contact outside agencies,

14

including the FDA.  The mediators took no action against Defendant Folberg nor did they recommend that UIC do so.

33.    On or about December 9, 2005, Dr. Maes informed Dr. James Carson, Administrative Director of the Department of Pathology and someone who reported directly to Defendant Folberg, that there had been no Quality assurance/Quality Control meeting to assess whether changes in the Donor Room had solved the problems.  Dr. Maes had continually sought to have such meetings since October, 2005 but was thwarted in those efforts by Sosler and Defendant Folberg.  Due to ongoing concerns about continuing violations that affected donor and patient safety, she indicated that she would not sign the FDA BB/DR registration and other documents for the FDA until she was confident that issues were being resolved.

34.    During the period from December, 2005 through May, 2006, Dr. Maes attempts to correct the deficiencies in the Blood Bank, BBDR and BBHC were undermined by Sosler and Dr. Greg Chejfec, the Interim Director of Clinical Pathology.

35.    As part of her obligations to engage in research, Dr. Maes had been collaborating with Dr. Larry Ulanski, an ophthalmologist, on a clinical study with Occulogix, a company that has designed a devise that assists in cleaning the blood of patients.  In early January, she was not invited to a meeting convened by Defendant Folberg even though she was a Co-Investigator.  In a discussion

15

after that meeting, Defendant Folberg stated his intention of removing Dr. Maes as Co-Investigator and then acted to remove her at a later time period.

36.    Issues with respect to the Occulogix study arose due to staffing shortages caused by Defendant Folberg's failure to process the needed new hire approval. During a week in which Occulogix sent a trainer to train staff to conduct the research study, patients whom were ill, were not given prompt treatment due to the staffing shortages caused by Defendant Folberg. Dr. Maes reported these issues to Occulogix and was criticized for doing so by Defendant Folberg. The failings of Defendant Folberg and his decision to remove Dr. Maes from her position as Co-Investigator of this study jeopardized important research for the UIC Medical Center as well as patient safety.

37.    In late January and April, 2006, a Quality Inspection of the Blood Bank and related entities was conducted by Patrick Ooley, an independent expert hired by UIC for the purpose of helping the UIC Medical Center respond to the FDA notification of violations. Defendant Folberg attempted to control Dr. Maes' access to Mr. Ooley during this period although prior to his visit, she sent him documentation of the violations she and the FDA had found. In one of several meetings that she was allowed to attend, she discussed falsification of records with him and that most, if not all, blood products collected by the BBDR to date and transfused to patients or stored in the Blood Bank were of questionable safety due to the numerous violations of FDA regulations. Dr.

Maes was not allowed to attend the final summation meeting with Mr. Ooley or to see his final report which Defendants are attempting to keep confidential.

38.    On information and belief, Mr. Ooley's final report is consistent with Dr. Maes findings of violations of federal regulations and supports her efforts to correct the problems that led to these violations and indicates that persons, whom Mr. Ooley interviewed, told him that Dr. Maes was the primary person concerned about patient care and safety.

39.    On March 10, 2006, Dr. Maes attempted to attend an emergency meeting of the BBDR staff called by Defendant Folberg but when she arrived, she was excluded by him even though she was still serving as Director of the BBDR at that time.

40.    Dr. Maes alerted Dr. Chamberlin and Dean Flaherty to the adverse employment decisions being taken against her as described above in ¶28-30, 35-7, 39 by Defendant Folberg as a result of her complaints about violations of federal regulations and the obstacles she was encountering in correcting these deficiencies but they did nothing to intervene to stop the retaliatory conduct. On information and belief, they acted to support the retaliation and did not act to ensure that FDA and Medicaid/Medicare violations were being corrected so that blood donors and patients would receive quality care and not be subjected to unsafe practices. [February 25, 2006 Letter from Dr. Maes to Dr. Chamberlin and Dean Flaherty, attached hereto as Exhibit B].

41.    On May 1, 2006, Dr. Maes came down with a serious, life-threatening eye disease.  She was hospitalized and treated with antibiotics.  She was off work until June 5, 2006 due to this serious condition.  During this time, Defendant Folberg's office had her complete necessary paperwork to have this leave treated as a medical leave under the FMLA and the leave was approved.

42.    When Dr. Maes first reported back to work from her FMLA medical leave on June 5, 2006, she was not given an opportunity to get medical clearance from the appropriate UIC Medical Center staff but instead, at the direction of Defendant Folberg, was informed she had to meet immediately with Dr. Carson and Dr. Chejfec at which time she was given two letters from Defendant Folberg.  One informed her that she was being terminated from her position at the UIC Medical Center and that her last day in the position would be August 15, 2006.

43.    The second letter stated that "[e]ffective immediately and extending through August 15, 2006, she would not have any clinical responsibilities in the Department of Pathology... and you are reassigned to non-clinical academic duties.  It further provided that she was not to "visit the blood bank, the donor center, or any area engaged in the clinical operation of the Department of Pathology."  She was reassigned to a new office and told to immediately give the laptop computer, provided to all UIC College of Medicine to the Department of Pathology so that a copy of the hard drive could be

18

made, even though, under the terms of these letters, she remained a faculty member in the College of Medicine. Finally, she was told to focus her efforts on her position as pathology liaison with the College of Dentistry and collaborations with a member of that college, Dr. Joel Schwartz..

44.    Dr. Maes informed Dr. Carson that the laptop computer was at home and that she would bring it in the next day and he indicated his agreement. She was then informed that she had to immediately clear out her office and later Dr. Carson, acting at the direction of Dr. Folberg, had her belongings searched in her office with the door open.

45.    Dr. Carson, acting under the direction of Defendant Folberg, then told her to go with UIC police, who due to a call made to them prior to her meeting with Dr. Carson and Dr. Chejfec were already waiting for her to drive her home immediately to retrieve the laptop computer and bring her back to the UIC Medical Center. Dr. Maes believed that she had no choice but to go with the police officers in a car to her residence. She was humiliated by having her belongings searched and in being taken into custody and driven to her home as if she was a common criminal. On June, 5, 2006, she was in the custody of the UIC police for several hours at the direction of Defendant Folberg. Her laptop computer was seized without probable cause and a copy of the hard drive was made without probable cause or any legitimate basis. These actions were undertaken in order to further Defendant Folberg's

19

retaliatory motives. In all these actions, she was treated adversely and differently than UIC faculty members who do not report violations of law and regulations.

46.     In removing Dr. Maes from all clinical pathology areas of the UIC Medical Center including the Blood Bank, Defendant Folberg and the UIC Medical Center violated JCAHO rules requiring specific processes for the transfer of patients from one doctor to another in order to assure a continuum of quality care. Defendant Folberg also failed to take appropriate steps to ensure that residents and interns received appropriate supervision in the care of patients in the Blood Bank, BBDR and BBHC.

47.     Dr. Maes wrote Dr. Chamberlin and Dean Flaherty regarding the incidents of June 5 but they did not respond or take appropriate action to correct Defendant Folberg's unlawful actions and to ensure patient safety and quality medical care at the Blood Bank. [June 5, 2006 Letter to both of them, attached hereto as Exhibit C]. She also wrote to Defendant Folberg that the restriction of her access to the UIC Medical Center compromised or prevented the completion of outside grant clinical trials and the completion of clinically-based articles that she had been collaborating on with other doctors and being able to attend continuing medical education seminars in her field of expertise. [June 12, 2006 Letter to Defendant Folberg attached hereto as Exhibit D].

48.     At the time of her removal from clinical duties at the UIC Medical

20

Center, Defendants were in the process of responding to the FDA violations in a manner that did not fully acknowledge wrongdoing or what was needed to prevent future violations and which Defendant Folberg and those working with him knew that Dr. Maes would not accept.

49.     Thereafter, Dr. Maes contacted Dr. Schwartz, her liaison at the College of Dentistry to discuss the pathology course they were to teach at the College of Dentistry. He also discussed with her the possibilities of her collaborating with him on his research.

50.     As a result of these discussions and Dr. Maes' initial research collaborations Dr. Schwartz, she was informed in writing in June, 2006 that the Dental School was going to hire her in late August to perform research with Dr. Schwartz.

51.     In order to facilitate her employment with the College of Dentistry, she had to communicate with Pramod Mehrotra, the business manager of the Pathology Department, because after August 15, 2006, she was still listed as a full-time employee.

52.     Shortly after that communication, Mr. Mehrotra, acting under the direction of his boss, Defendant Folberg, contacted the Dean of the College of Dentistry in order to pressure him to cancel the agreement to hire her. Mr. Mehotra told the Dean that Dr. Maes was a "troublemaker." There were further malicious and false communications from or caused by Defendant Folberg with

the Dean of the College of Dentistry in order to get the Dean to rescind the offer to Dr. Maes as part of a campaign of retaliation and other malicious conduct against her. Defendant Folberg ultimately was successful in doing so and on or about September 8, 2006, the offer was withdrawn.

53.  Nevertheless Dr. Schwartz still needed Dr. Maes' collaboration to complete his research, which would result in improving the knowledge base for development and treatment of oral cancer and in bringing outside grant money to the UIC Medical Center. Dr. Maes agreed to continue collaborate on Dr. Schwartz's research without pay, but again due to the intervention of Defendant Folberg, she was not allowed to do so. Defendant Folberg also has acted to restrict Dr. Maes' access to her research start-up funds that she was attempting to use in her collaboration with Dr. Schwartz.

54.  Dr. Maes was scheduled to teach the pathology class in the College of Dentistry during fall semester as referred to in Defendant Folberg's June 5, 2006 letter to her (Ex. E) but after October, 2006 she was excluded from teaching through the intervention of Dr. Folberg. She also was removed as the Co-Director and teacher of a pathology class in the College of Dentistry for the winter semester in 2006-07 through his intervention. She also has been removed from teaching pathology in the College of Medicine.

55.  In the fall of 2006, Defendant Folberg falsely, maliciously, wantonly, willfully and in bad faith informed the Dean of the Dental School that Dr. Maes

had committed plagiarism with respect to distributing assigned reading to the medical students she was teaching in November, 2005. This communication was concealed from Dr. Maes and she had no way of learning that it had occurred until August, 2007. In fact, Dr. Maes had not committed plagiarism. The incident which Defendant Folberg seized upon over six months after it had occurred to turn it into this false and malicious charge had been well known to the Pathology Department course director at the time it occurred. The course director had determined at the time of the incident that any suggestion of Dr. Maes' wrongdoing was improper. No administrative processes, which were supposed to be initiated when such an allegation was believed to have merit, were initiated. Nothing more was made out of it until Defendant Folberg desired to use it as part of his retaliatory campaign against Dr. Maes for her reporting of violations of law and participation in investigations to identify and correct those violations. After this incident and the course director's determination that Dr. Maes had not committed plagiarism or any misconduct, she continued to teach thereafter through the spring semester.[1]  On information and belief, Defendant Folberg has since November 21, 2007, made or caused to be made this same

---

[1] There are other serious incidents in which Defendant Folberg has acted dishonestly and in  bad faith, maliciously, wantonly and willfully in taking actions that have and will seriously jeopardize and/or destroy Dr. Maes career as a physician but documents regarding these incidents have been designated as confidential pursuant to a protective order in the federal case. As soon as a protective order is entered in this case, Dr. Maes intends to contest the confidentiality of the facts related to these incidents and then will seek to amend her complaint.

23

and other false and malicious accusation in a wanton and willful manner to decision-makers within the College of Medicine who are considering a tenure decision regarding Dr. Maes and outside of the College in a manner than has caused and will continue to cause great harm to Dr. Maes' career in academic medicine.

56.    Defendant Folberg has engaged in the actions described in ¶55 and other actions as part of an overall plan and practice to remove her from various positions within the UIC Medical Center, terminate her employment at the UIC Medical Center, prevent her employment with the College of Dentistry; prevent her from being able to teach at the UIC Colleges of Medicine and Dentistry, take away research opportunities, deny her tenure and terminate her employment at the College of Medicine and prevent her from obtaining any future employment as a doctor or as an academic in retaliation for the reporting of serious violations of federal law and regulations, some of which adversely affected patient care and safety.  This plan and practice described herein is ongoing.

57.    In September, 2006, AABB representatives inspected the UIC Medical Center Blood Bank.  On information and belief, they found serious problems that posed potential life-threatening patient harm in the areas that Dr. Maes had been attempting to correct but could not due to Defendant Folberg's resistance.

58.    Prior to coming to UIC and since she has been there, Dr. Maes has been active in the AABB and has given several presentations at the Annual Convention, including serving as Director and Moderator of "Ask the Experts" since 2004.  She is a co-author of the recently published *Practical Guide to Transfusion Medicine, 2nd Edition* (AABB, 2007), one of the only two textbooks recommended for the teaching of Transfusion Medicine to health professionals, medical students, residents and fellows.   She is a director on the board of the American Society for Apheresis.  She has also served on the Transfusion Medicine Advisory Committee for the American Society of Clinical Pathologists.  She has made numerous scientific and clinical presentations at meetings of these and other medical organizations.

59.    Dr. Maes' removal from her position as Director of Clinical Pathology through her forced resignation as described in ¶¶29-30, her removal as ordered by Defendant Folberg, from the Occulogix study as described in ¶¶35-6, from all clinical activities in Pathology as described in ¶¶43-6, the actions of Defendant Folberg and others at UIC in preventing her from being hired at the College of Dentistry and from conducting research and teaching there and her removal as an instructor in the pathology course at the College of Dentistry and at the College of Medicine and the pattern of actions by Defendants described in ¶¶55-6 above has damaged her academic career in terms of obtaining tenure and her research career in terms of grants and publications.

60.    The above-described actions of Defendant Folberg, whether undertaken solely by himself or in concert with others, has caused Dr. Maes to suffer emotional distress and humiliation.

61.    At all times relevant hereto, Defendant Folberg and those acting under his direction or in concert with him in undertaking the actions described in ¶¶ 17-59 were acting under color of state law but outside the scope of his authority in that his actions toward Dr. Maes and in attempting to cover-up the FDA violations found by her were malicious, wrongful and inconsistent with state and federal law and the purposes for which the UIC Medical Center exists.

V.    <u>Claims for Relief</u>

<u>Count I</u> (Illinois Law Claim Pursuant to 5 ILCS §430/15-5 *et seq* Against Defendants Folberg and Board of Trustees re-filed from federal lawsuit)

1.-61.   Dr. Maes realleges and incorporates paragraphs 1.-61. as Paragraphs 1.-61. of Count IV of her Complaint.

62.    Section 5-15 of the State Officials and Employees Ethics Act, 5 IICS 430/15-10 prohibits the taking of retaliatory action by a State agency or employee against a State employee because s/he 1) disclosed or threatened to disclose to a supervisor or to a public body an activity, policy or practice of any State agency or other State employee that the State employee reasonably believes is in violation of a law, rule, or regulation; or 2) provides information to any public body conducting an investigation, hearing or inquiry into any

violation of law, rule or regulation by any State agency or State employee.

63.    Defendant Board of Trustees, along with the UIC Medical Center and the College of Medicine is a State agency within the meaning of 5 ILCS 430/15-5. The FDA is a public body within the meaning that same statute. Defendant Folberg is a State employee within the meaning of 5 ILCS 430/15-5. He, Dr. Chamberlin and Dean Flaherty are supervisors within the meaning of 5 ILCS 430/15-5.

64.    Pursuant to 5 ILCS 430/15-5 and 15-20, the actions caused to be or against Dr. Maes taken by Defendants Board of Trustees and Folberg as specified in ¶¶29-30, 35-6, 42-5, 47, 51-6 above were adverse employment actions in retaliation for Dr. Maes' protected activity as described in ¶¶21-7, 31-7 and 46-8. That protected activity was at a minimum a contributing factor that caused such adverse employment actions to be taken against her.

65.    Pursuant to 5 ILCS 430/15-25 Dr. Maes is entitled to all remedies necessary to make her whole and prevent future violations of the Act. She is entitled to damages for backpay (at least $80,000), compensatory damages for emotional distress and the damage to her career as an academic, physician and researcher and ("necessary to make her whole"). Such damages can include two times the amount of back pay she has lost, interest on back pay.

66.    Dr. Maes has also suffered irreparable injury for which there is an insufficiently adequate remedy at law and hence is entitled to reinstatement to

27

her positions as Director of Clinical Pathology and Transfusion Medicine and as a

teacher in the Colleges of Medicine and Dentistry full fringe benefits and

seniority rights and reasonable attorneys fees.

67.    In order to prevent future violations of these whistleblower

provisions, Dr. Maes is entitled to an award of punitive damages against

Defendant Folberg.

Count II (common law tortious interference with economic opportunity claim
against Defendant Folberg only  not previously filed)

1.-61.    Dr. Maes realleges and incorporates paragraphs 1.-61. as

Paragraphs 1.-61. of Count II of her Complaint.

68.    As alleged above, from June to September, 2006, a) Dr. Maes had

a reasonable expectation of employment and research opportunities with the

College of Dentistry conducting research with Dr. Schwartz and teaching a

course in that college in addition to her position as an associate professor in the

College of Medicine; b) Defendant Folberg had knowledge of that expectancy;

3) in order to further his retaliation against Dr. Maes for her whistleblower

conduct, Defendant Folberg maliciously, intentionally, wilfully, wantonly and/or

in bad faith induced or caused that expectancy to be terminated as alleged in

¶¶50-6 above; and d) Dr. Maes has suffered damages in terms of lost wages ,

humiliation and  harm to her career.

69.    Dr. Maes is entitled to an award of damages for lost back pay and

front and compensatory damages for humiliation and emotional distress and

harm to her career.

70.     In order to deter such future wanton, malicious and willful conduct, Dr. Maes in entitled to an award of punitive damages.

71.     Defendant Folberg's conduct as alleged above was not within the scope of his duties with the UIC Medical Center or College of Medicine in that he acted maliciously and he had an independent duty as the academic head of a department of a university to not falsely and maliciously make accusations about a department member that would harm her academic career.

Count III (common law defamation claim against Defendant Folberg only not previously filed)

1.-61.   Dr. Maes realleges and incorporates paragraphs 1.-61. as Paragraphs 1.-61. of Count III of her Complaint.

71.     As alleged in ¶56 above, Defendant Folberg made unprivileged false assertions of plagiarism about Dr. Maes when, in fall, 2006, he secretly and maliciously made false statements to the Dean of the College of Dentistry that Dr. Maes had committed plagiarism and on subsequent occasions when he is believed to have made such communications within the College of Medicine to colleagues in order to prevent Dr. Maes from receiving tenure.  On information and belief, he also made or caused to be made such false and malicious statements to persons outside the College of Medicine.  If in fact, Defendant Folberg believed that Dr. Maes had committed plagiarism, he would have been compelled to initiate procedures to investigate and decide the legitimacy of

29

such a claim but he has never done so.

72.    Such false assertions (and others, see ¶55,n. 1) are defamatory *per se* because they words that impute an inability to perform or a want of integrity in the discharge of duties of Dr. Maes' career as an academic and are words that prejudice her in her profession as an academic medical professional.

73.    In the alternative, Defendants false assertions are defamatory *per quod* in that Defendant Folberg directly intended to injure Dr. Maes and there was reckless disregard of her rights and of consequences which might result to her.

74.    Defendant Folberg's conduct as alleged above was not within the scope of his duties with the UIC Medical Center or College of Medicine in that he acted maliciously and against the law of the State of Illinois and the interests of the UIC Medical Center.  In addition, his duties to Dr. Maes arose from his position as the academic head of a department of a university to not falsely and maliciously make accusations about a department member that would harm her academic career.

75.    As a result, Dr. Maes is entitled to an award of damages for her economic loss, compensatory damages for emotional harm and humiliation and the harm to her career.

76.    In order to deter such future wanton, malicious and willful conduct, Dr. Maes in entitled to an award of punitive damages.

Count IV (Previously Filed FMLA Claim of Denial of Return to Position After Approved Medical Leave against Defendant Board of Trustees only)

1.-61.  Dr. Maes realleges and incorporates paragraphs 1.-61. as Paragraphs 1.-61. of Count IV of her Complaint.

77.    At all times relevant hereto, Dr. Maes has been an employee and Defendant Board of Trustees and Defendant Folberg have each been an employer within the meaning of the FMLA, 29 U.S.C. § 2611. In the year preceding May 1, 2006, Dr. Maes worked more than 1,250 hours at the UIC Medical Center and College of Medicine.

78.    Dr. Maes' leave from May until June 5, 2006 was for a serious medical condition that made her unable to perform the functions of her position within the meaning of 29 U.S.C. §2612(a)(D).

79.    Defendants' removal of Dr. Maes from her clinical responsibilities and her appointment at the UIC Medical Center upon return from an approved leave violated her rights under 29 U.S.C. §2614(a) and is a prohibited act under 29 U.S.C. §2615.

80.    As a result of Defendants' violation of the FMLA as described above, Dr. Maes is entitled to an award of damages for the amount of wages lost after August 15, 2006 due to the loss of her appointment at the UIC Medical Center (at least $80,000), the interest on all such damages and liquidated damages equal to the sum of lost wages plus interest as provided by 29 U.S.C. §2617(a)(1)(A) and reinstatement to her position as Director of Transfusion

Medicine and the Blood Bank as provided by 29 U.S.C. §2917(A)(1)(B).

Count V  (Previously Filed Section 1983 Claim Against Defendant Folberg only for Infringement on  Dr. Maes First Amendment Rights)

1.-61.  Dr. Maes realleges and incorporates paragraphs 1.-61. as Paragraphs 1.-61. of Count V of her Complaint.

81.    The First Amendment of the United States Constitution protects the rights of citizens, including state employees to exercise their right to speak out about matters of public concern.

82.    Such protected rights of free speech encompass complaints about wrongdoing at a state hospital and the violation of federal regulations and rules of hospital accreditation agencies that seek to protect patient's safety and ensure that hospitals and medical professionals provide quality medical care.

83.    Plaintiff Maes, as an academic and treating physician, has specialized knowledge and insight that make her views about violations of regulations that affect patient safety and the quality of care particularly well-informed. It is vitally important that public agencies be able to hear those viewpoints.

84.    In communicating about the FDA violations, the cause of those violations and problems in remedying them to the FDA and Mr. Ooley as described in ¶¶20-7, 33, 35-6, 37, 40, Dr. Maes was speaking not only as Director of Clinical Pathology and Transfusion medicine but also as a citizen, physician and academic in making sure that violations of federal law that undermined

patient safety and the quality of care were addressed

85.    As described above, Defendant Folberg consistently made clear to Dr. Maes that her job duties did not include communicating with outside agencies about matters of public concern like violations that affected patient safety  and the quality of care.  Her job description does not include the reporting of violations to governmental agencies, included not limited, to the FDA.

86.    Defendant Board of Trustees and high level personal at the UIC Medical Center and the College of Medicine in the past have acted to punish persons who have exercised their First Amendment rights to speak out about issues affecting patient safety and the quality of care at the UIC Medical Center in a manner that makes clear that it is not within a physician or other medical professional's job description to engage in such speech.  On information and belief UIC attorneys and the Office  of Access and Equity enable UIC Medical Center and College of Dentistry officials to silence whistleblowers and those exercising their First Amendment rights by not preventing unwarranted disciplinary action.

87.    When Defendant Folberg engaged in the retaliatory actions described above (¶¶29-30, 35-6, 42-5, 47, 51-6), there were clearly established principles of First Amendment case law rendering such conduct unconstitutional.  As such, Defendant Folberg's conduct was not objectively

33

reasonable.

88.    Defendant Folberg lacked any adequate justification for retaliating against Dr. Maes for the exercise of her right of free speech by forcing her to resign as Director of Clinical Pathology, removing her as Co-Investigator from the Occulogix study, canceling her appointment as Director of Transfusion Medicine,  causing her to be placed under the custody of UIC police, causing her employment with the College of Dentistry to be cancelled, causing her to be denied to conduct research at the College of Dentistry without pay and causing her to be removed as a teacher of the pathology course in the College of Dentistry and College of Medicine as described above.

89.    As a result of Defendant Folberg's retaliatory actions against Dr. Maes, she has  suffered lost back pay and emotional distress and humiliation and her career as an academic, physician and researcher has been harmed, entitling her to an award of compensatory damages against Defendant Folberg.

90.    Defendant Folberg's actions as described above were undertaken intentionally and in reckless disregard for Dr. Maes' First Amendment rights.  In order to deter future misconduct, Dr. Maes is entitled to an award of punitive damages.

91.    The ongoing pattern of retaliatory conduct by Defendant Folberg has caused Dr. Maes irreparable harm for which there is no adequate remedy

at law.  Consequently she seeks a prohibitory, prospective  injunction against Dr.

Folberg in his official capacity to seek and desist such retaliatory conduct and a

mandatory prospective injunction against Defendant Folberg in his official

capacity to reinstate Dr. Maes to her positions as Director of Clinical Pathology

and Director of Transfusion Medicine.

Count VI (Section 1983 Fourteenth Amendment Due Process Stigma Plus Claim
against Defendant Folberg in his personal and official capacity not previously
filed)

     1.-61.  Dr. Maes realleges and incorporates paragraphs 1.-61. as

Paragraphs 1.-61. of Count VI of her Complaint.

     92.    The Fourteenth Amendment protects a state employee's liberty

interest through the "stigma-plus" test which is applicable when a state

employer creates and disseminates a false and defamatory impression about

the employee in connection with termination because it deprives the employee

of a protected liberty interest.

     93.    As alleged above, Defendant Folberg has caused Dr. Maes to be

removed from her positions as Director of Clinical Pathology and Director of

Transfusion Medicine, removed her from clinical responsibilities including patient

care at the UIC Medical Center, caused her not be hired at the College of

Dentistry and caused her to be removed as a teacher in both the Colleges of

Medicine and Dentistry and is the process of taking actions to prevent her from

being given tenure.

94.    Along with all these terminations, Defendant Folberg has made false, defamatory charges against Dr. Maes that she engaged in plagiarism to the Dean of the College of Dentistry, those considering her tenure decision and on information and belief, others outside of the UIC Medical Center and Colleges of Medicine and Dentistry. See ¶¶55-6 above. The impact of these and other charges (see ¶55, n. 1) will be to prevent her from having a career in academic medicine in both state and private universities or as a doctor in private practice or as a teacher.

95.    As prospective injunctive relief against Defendant Folberg in his official capacity for this stigma plus violation, Dr. Maes seeks a name clearing hearing.

96.    Due to the severity of the damage to Dr. Maes' ability to obtain future employment as a doctor or an academic, she is entitled to an award of compensatory damages for emotional distress and humiliation and for the harm caused to her career and, in order to deter future constitutional violations to an award of punitive damages against Defendant Folberg in his personal capacity for the willful and wanton disregard for her constitutional rights as alleged herein.

97.    When Defendant Folberg engaged in the retaliatory actions described above, there were clearly established principles of stigma plus due process law rendering such conduct unconstitutional. As such, Defendant Folberg's conduct was not objectively reasonable.

36

Count VII (Section 1983 Fourth Amendment Claim against Defendant Folberg only)

1.-61.   Dr. Maes realleges and incorporates paragraphs 1.-55. as Paragraphs 1.-61. of Count VII of her Complaint.

98.      On or prior to June 5, 2006, Dr. Maes did not engage in any act which would have caused a reasonably prudent government employee to have a belief that causing state police to transport her home for purposes of seizing her computer was reasonably related to any legitimate purpose as there was no allegation that Dr. Maes had engaged in any wrongdoing.  Rather the seizure of the computer was part of the retaliatory and unlawful actions taken by Defendant Folberg against Dr. Maes for her protected activity.

99.      In causing Dr. Maes' laptop computer to be seized by having her transported to her home by UIC police, as described above, Defendant Folberg acted willfully wantonly, maliciously and without probable cause in reckless disregard of her Fourth Amendment right to be free from unreasonable seizure of her property.

100.    As a direct and proximate result of the above described wrongdoing at the direction of Defendant Folberg, Dr. Maes was deprived of her property rights as protected by the Fourth and Fourteenth Amendments to the United States Constitution.

101.    When Dr. Folberg caused the UIC police to seize her laptop

37

computer on June 5, 2006, there were clearly established principles of First Amendment case law rendering such conduct unconstitutional. As such, Defendant Folberg's conduct was not objectively reasonable.

102.    As a result of the aforesaid actions, Dr. Maes is entitled to an award of compensatory damages.

103.    Defendant Folberg's conduct was intentional, malicious and in bad faith and done with reckless or callous indifference to Plaintiff's federally protected rights. To deter such future conduct requires an award of punitive damages as allowed under 42 U.S.C. §1983.

VIII.  Prayer For Relief

WHEREFORE Plaintiff prays that this Court:

A.     Order that Defendant Trustees reinstate Dr. Maes to her positions as Director of Clinical Pathology and Director of Transfusion Medicine, to remove any record of her removal as Director of Transfusion Medicine or her appointment at the UIC Medical Center and to remove any record of her having committed plagiarism.

B.     Order Defendants Trustees and Folberg to make Dr. Maes whole by giving her back pay (doubled pursuant to Counts I and IV), lost fringe and pension benefits with prejudgment interest, and compensating her for the damage to her career as an academic, physician and researcher pension.

C.     Grant Dr. Maes an award of compensatory damages on Counts I, II,

38

III and V, VI and VIII against Defendant Folberg and against Defendant Board of

Trustees on Counts I and IV for the emotional harm and humiliation she suffered

as a result of the acts complained of above.

     D.     Permanently enjoin Defendants from retaliating against

whistleblowers like Dr. Maes.

     E.     Grant Plaintiff a judgment for punitive damages against Defendant

Folberg on Counts I, II, III, V, VI and VII in an amount sufficient to deter him.

     E.     Grant Plaintiff reasonable attorneys fees, costs and fees for experts

on Counts I, IV, V, VI and VII and reasonable costs on Counts II and III.

     F.     Grant Plaintiff such other relief as this Court deems necessary and

proper.

Steven Saltzman
Attorney for Plaintiff

Steven Saltzman
122 South Michigan Avenue
Suite 1850
Chicago, Illinois  60603
(312) 427-4500
Attorney No. 50191

**From:** Robert Folberg, MD [rfolberg@uic.edu]
**Sent:** Wednesday, May 18, 2005 10:02 AM
**To:** Chamberlin, William
**Subject:** Re: Kudos
Dear Bill,

I deeply appreciate this feedback!

Thank you very much ... this is only the start ..

Bob

Chamberlin, William wrote:

> Robert,
>
> I wanted to let you know that Dr Maes was brilliant yesterday with the Urologists. She not only
> convinced them of the need for competency training, she agreed to create a special training
> program for Urology residents to indoctrinate properly to the mysteries of the examination of urine
> sediment. It is one of the few times where everyone walked away from a meeting with smiles on
> their faces. Congratulations on a fine choice for Director of the Clinical Labs!

```
--
Robert Folberg, MD
Frances B. Geever Professor and Head
Deputy Director, University of Illinois Cancer Center
Department of Pathology
University of Illinois at Chicago
1819 W. Polk Street, 446 CMW
Chicago, IL 60612

Phone: 312/996-4601
Fax:   312/996-7586
web:   http://www.medicine.uic.edu/pathology
       http://eyepath.comd.uic.edu
```

Exhibit A

February 25, 2006

Dean Flaherty and Dr. Chamberlain,

I am writing to both of you because actions continue to be taken against me that have harmed my research patients, my reputation, my career, my ability to practice medicine, and have the potential to harm my clinical patients. The purpose of this letter is to highlight Dr. Folberg's continuing efforts to undermine my actions which has directly caused two serious issues in the Blood Donor and Hemotherapy Center (BDHC), the loss of the Occulogix Clinical Research Project, and continues to place our patients, donors, and UIC at risk for medical and legal actions.

In my previous communications to you I have described the serious infractions I had discovered in the BDHC, including the falsification of records. I stated that I believed that these issues were a direct result of the incompetence, inadequate knowledge, and poor management skills on the part of the manager, Steve Sosler. It was clear to me shortly after assuming the Directorship (4/1/05) that his incompetence was causing serious issues in the BDHC, predating the discovery of the FDA violations. Although, I repeatedly raised these issues with both Dr. Folberg and Dr. Carson, and expressed my concern that his incompetence and his unwillingness to work with me could lead to serious issues, these concerns were completely disregarded. Mr. Sosler has continued to disregard my recommendations and his failure to act on my requests has now led to a critical level of staffing in the BDHC.

One of my first recommendations was the immediate replacement of any loss of staff and an evaluation of need for additional staff, recognizing that the training period for a fully trained hemapheresis technician (HT) or RN is a minimum of 6 months, and we are on call 24/7. Mr. Sosler failed to even begin screening applicants until December of 2005 for a position that opened in July, despite repeatedly raising my concerns about Mr. Sosler's lack of action to Dr. Folberg and Dr. Carson. We finally obtained an agreement this month. The new hire is not even scheduled to begin until the middle of March and will be independent by August at best. I have yet to see any evaluation or requests for additional staff, although this issue has also been repeatedly raised with both Mr. Sosler and Dr. Carson.

Due to our reduced levels of staffing, I have had to reduce the services we offer to the Solid Organ Transplant Services (Sunday scheduled procedures, transfusions, IVIg infusions, and Retuximab infusions), the Bone Marrow Transplant Services (transfusions, and electrolyte replacement therapy), and transfusions in general. We have had to juggle the treatment timing of our patients, including performing these procedures very early in the morning, to ensure adequate staffing during normal working hours. Despite our efforts, we have had patients wait as much as two hours for scheduled procedures, and have had to reschedule desperately needed platelet apheresis donors (one donor up to three separate times). Until now this was considered an internal problem by the Department, however, the inadequate staffing issue has now reached critical levels. I have only three trained full-time staff available to perform all of the automated blood donor collections and the therapeutic procedures.

The staffing shortage clearly compromises the safety of our patients and staff. However, it has also impacted our ability to participate in the Occulogix clinical research trial. Our site was placed on Hold this week by the sponsor because of the inability of our staff to commit to the required training. This occurred because we could not allocate the necessary time for adequate training and still treat our patients. This occurred despite the fact that Dr. Ulanski and I had negotiated additional money from the sponsor in order to allow the BDHC to hire an RN, a hire which has yet to be requested. This is a loss of up to $134,000 to UIC. With the loss of sponsorship, we have lost the ability to be the only site in the Midwest with the capability of offering this therapy for such a devastating disease as Macular Degeneration.

It is also clear that the number of instruments to treat our patients is woefully inadequate. The purchase of an additional instrument was approved by the hospital over 12 months ago, and despite my repeated requests, and those of other UIC physicians; we have yet to purchase the instrument. Our limited resources hamper our ability to respond to emergencies, has caused patients to wait despite prior scheduling of a procedure, and do not allow us to safely collect blood products during shortages. In addition, we have been unable to collect stem cells from more than one patient at a time, which has greatly impacted the ability of the BMT department to properly treat their patients.

Although these issues have been building for some time, Mr. Sosler's and Dr. Folberg's continued disregard and failure to act on my recommendations have now led to a serious staffing shortage, the loss of a significant research project, and have placed the safety of our patients in jeopardy.

Dr. Folberg's ongoing efforts to undermine my activities have also placed the UIC IRB and the ability of UIC to continue in clinical research activities at risk. I have just learned that at Dr. Folberg's request the final contract and the PAF for the previously mentioned Occulogix project was never sent to the Contracts Office. Until Dr. Ulanski notified me of the situation, I did not know that I have been screening and treating patients for two months without a subcontract. I am concerned because I do not know if there are any other situations where my paperwork has "disappeared", which could have legal ramifications. I do know that my e-mail account has been entered and violated, markedly raising the level of my concern for my personal privacy and safety here at UIC.

I continue to believe that these actions have been undertaken by Dr. Folberg in retaliation for my having made full disclosure to the Food and Drug Administration as required by law of the numerous violations of federal regulations that occurred in the BDHC; and of the improper billing of Medicare and Medicaid patients by the Department of Pathology. Many of the changes I have recommended to Dr. Folberg and Dr. Carson as a result of my investigation have been disregarded, placing our patients, our donors, the BDHC staff, the UIC Hospital, and UIC at risk for serious medical and legal ramifications.

I have been and continue to be committed to improving the laboratory and/or laboratories over which I have oversight to ensure quality care for our patients and donors. However, this continuing harassment by Dr. Folberg has seriously compromised my ability to adequately care for my patients, and the patients of other UIC physicians.

I have requested that the both of you, Dean Flaherty and Dr. Chamberlain, meet with me to discuss previous issues on three separate occasions but have received no reply. I would like to request again that we meet to discuss these issues and what steps are necessary to prevent this continuing harassment of me by Dr. Folberg and allow me to turn my focus toward my responsibilities and my career.

Sincerely,


Lou Ann Young Maes, MD, MS, FASCP, FCAP

Joseph A. Flaherty, M.D.
Dean, College of Medicine
Office of the Dean
131 CMW, MC784

William H. Chamberlin, M.D.
Chief Medical Officer
Hospital Administration
University of Illinois Medical Center at Chicago
1740 W. Taylor St., Suite 1400, M/C 693

June 5, 2006

Dean Flaherty and Dr. Chamberlin,

I am once again writing to you because actions continue to be taken against me which I believe are harmful to my employment and career, but even more importantly, affect the continued well-being of the UIC patients and donors. Today, I returned to work after being out on Family Medical Leave for a serious medical condition, to be handed a letter from Dr. Folberg by Dr. Chejfec and Dr. Carson, that stated effective immediately I was relieved of any clinical responsibilities in the Department of Pathology and not allowed to visit any areas engaged in the clinical operations of Pathology. I was given no reason(s) for these actions. This effectively renders me unable to continue my ongoing collaborative work on clinical papers or research projects with other clinical departments. I will be unable to attend most of the CME conferences in my own department.

In addition, I was told that I had been reassigned a new office effectively immediately and that everything I moved to this new office had to be inspected by one of three Pathology Senior level staff members (staff who used to work for me) before it could be packed. I was told to surrender any keys to any of the patient care areas and offices immediately and that I had to accompanied at all times when in any of these areas, including my own office. Furthermore, I and the staff members were told this in a busy section of the Clinical Pathology Laboratory where anyone passing by could have overheard the conversation.

I was also told that I had to surrender my computer immediately. When I said that I did not have my laptop with me as I expected to be in the hospital all day (it is my custom to use the UIC Hospital computers when in the hospital of which Dr. Carson is aware), I was told that I would be driven to my house by two UIC police officers and a Pathology employee in a marked UIC police vehicle in order to retrieve it. My computer is essential for my academic work and was assigned to me for that purpose. Since I continue to remain on the faculty, Dr. Folberg and the others involved had no right to seize my computer or to force me to be detained and transported by the UIC police officers. During this process, I did not feel free to leave the custody of these police or to choose not be driven to my home so they could take my computer.

Exhibit E

I have worked to try to correct the unlawful and medically unsafe conditions which I discovered and reported to FDA so that our patient's health and safety would not be threatened, and that continued existence of the UIC Medical Center programs would not be placed in jeopardy. In those efforts, I have been thwarted by Dr. Folberg and others, who desire to keep things as they were, cover up serious medical problems, and keep crucial information from me that directly impacted ongoing patient care. Despite my best efforts to improve the conditions in the Blood Bank and the Blood Donor Room and Hemotherapy Center, changes which I believe are necessary to ensure proper patient care, I have been demoted, marginalized, rendered ineffective, and now treated like a criminal in front of my colleagues, UIC Hospital Staff, my patients, my two Blood Bank fellows, my residents, my neighbors, and my daughter. All of these actions taken against me today at the direction of Dr. Folberg have caused me to suffer extreme humiliation and distress.

The actions taken today are in apparent violation the Family Medical Leave Act which covered my serious medical condition. Despite the fact that I informed Dr. Chejfec and Dr. Carson at a mandatory 8:30 a.m. meeting that I had been informed to report to Employee Health Services in order to be medically examined and declared fit for work, I did not have an opportunity to do so until 2 p.m.

These actions taken at the direction of Dr. Folberg, I believe are a direct result of my full disclosure to the Food and Drug Administration of the numerous violations of federal regulations, many of which remain today; and of the improper billing of Medicare and Medicaid patients by the Department of Pathology, and my attempt to correct these problems under the direction of the FDA.

Sincerely yours,

Lou Ann Young Maes, M.D.
Department of Pathology

Cc: R. Folberg, M.D.
    G. Chejfec, M.D.
    J. Carson, M.B.A., Ph.D.

June 12, 2006


Robert Folberg, MD
Professor and Head
Department of Pathology


Dear Dr. Folberg,

On Monday, June 5th, I received two letters from you, which removed my clinical duties and instructed me to pursue my academic endeavors.  However, as I understand the restrictions that you have placed upon me, I am expected to continue my academic endeavors without the ability to access any patient files, visit the patient care areas, and without access to my patient notes which were confiscated.  Since most of my collaborative efforts are clinical in nature, these restrictions as I understand them seriously hamper my ability to complete my already initiated academic endeavors.  For example:

1)  I am Principal Investigator on a clinical trial that is to be closed out within the next two weeks.  Based on my understanding of the restrictions you have imposed upon me, I am unable to work with the company and my colleagues as I am required to do under the terms of the contract.

2)  I am Co-Investigator on a related trial that is in the final stages of the close-out. Based on my understanding of the restrictions you have imposed upon me, I will be unable to participate in the closeout as required under the terms of the contract.

3)  I am collaborating with colleagues on a number of clinically-based articles that are in various stages of completion.  Based on my understanding of the restrictions that you have imposed upon me,  I will be unable to complete my portions of the articles because I will not have access to my patient notes.

Exhibit D

4) With the restrictions on my mobility that you have imposed upon me, I will be severely restricted in my ability to obtain CME credits within our department because most of the meetings take place in areas where there is ongoing patient care by the Department of Pathology.

In addition, today I have been unable to access the internet from my own office using my office computer. Has some restriction been placed on my ability to access the internet? If so, would you please inform me? Any restrictions placed upon my ability to access the internet would have unfavorable consequences on my ability to do my job. For example:

I am on many national committees, and collaborate with colleagues throughout the country; most of our communication is through the internet, so I need to maintain my internet access. In fact, for the past week I have been unable to access my personal e-mail files which contain papers upon which I am collaborating, both national and University efforts.

A lack of internet access would seriously compromise my ability to communicate with my students, my colleagues, and to even interact with members within the Pathology Department. I participate in several committees in the Pathology Department, and in the University, with our primary form of communication via the internet. In fact, I missed an important education meeting this morning because I did not know the meeting was to take place as I unable to receive the e-mail informing the committee members of the meeting with the time, place and agenda.

You have indicated that you expect me to continue my academic endeavors, which I greatly desire to do, but given the restrictions you have placed upon me as I understand them, I am severely impeded in my abilities to do so. If you do not intend me to be restricted as stated above, please let me know immediately.

Very truly yours,


Lou Ann Young Maes, MD


Cc: Joseph A. Flaherty, MD
    Dean, College of Medicine

    William H. Chamberlin, MD
    Chief Medical Officer