IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

LOU ANN MAES,                )
                                 )
      Plaintiff,         )    No. 07 CV 7180
                                 )
      v.                  )    Judge Moran
                                 )    Magistrate Judge Brown
ROBERT FOLBERG,         )
and BOARD OF TRUSTEES OF   )
UNIVERSITY OF ILLINOIS     )
                                 )
      Defendants.     )

**DEFENDANT ROBERT FOLBERG'S ANSWER AND AFFIRMATIVE DEFENSES TO
PLAINTIFF'S COMPLAINT FOR MANDATORY AND PROHIBITORY INJUNCTION
AND FOR ACTUAL, COMPENSATORY AND PUNITIVE DAMAGES**

       Defendant Robert Folberg, M.D. ("Dr. Folberg"), by his attorneys, Drinker Biddle
Gardner Carton, for his answer and affirmative defenses to the Complaint ("Complaint") of
Plaintiff Lou Ann Maes, M.D. ("Plaintiff" or "Dr. Maes"), states as follows:

**I.**      **Introduction**

       1.      This is an action brought to correct serious violations of state and federal law.  As
remedies, Plaintiff seeks mandatory and prohibitory injunctive relief as well as actual damages,
compensatory damages and punitive damages in an amount greater than the jurisdictional
minimum of the Law Division.  Four of the counts are a refiling of counts from a federal lawsuit
involving the same parties (06 C 6849) in which three federal counts were dismissed on
November 19, 2007 without prejudice (see Counts IV, V and VII below) pursuant to
Fed.R.Civ.P. 41(a)(2) and one count under Illinois law was dismissed on November 19, 2007 for
lack of subject matter jurisdiction due to sovereign immunity (see Count I below) because the
waiver of sovereign immunity contained in 745 ILCS §5/1 did not specifically provide waiver
for lawsuits brought in federal court as opposed to Illinois courts.

**ANSWER:**

       Denies the allegations except as hereafter admitted.  Admits Plaintiff purports to bring an
action under the FMLA, 29 U.S.C. § 2611 *et seq.,* 42 U.S.C. § 1983 (to redress alleged violations
of the First, Fourth, and Fourteenth Amendments by those acting under color of law), 5 ILCS §
430/15-5 *et seq.*, and under Illinois State law for tortious interference with prospective economic
opportunity and defamation.

       2.      The claims in this action are brought pursuant to a) the Illinois State Officials and
Employees Ethics Act, 5 ILCS §430/15-5 *et seq* to redress violations of the whistleblower

provisions of that Act which protects state employees from retaliation after they have reported violations of law or regulations or are providing information or participating in an investigation against both Defendants Folberg and Board of Trustees; b) common law claim for tortious interference with economic opportunity against Defendant Folberg in his personal capacity only; c) common law claim of defamation against Defendant Folberg in his personal capacity only; d) federal law claim pursuant to the Family and Medical Act ("FMLA"), 29 U.S.C. §2611 *et seq* to redress adverse employment decisions by Defendants after Plaintiff returned from an approved medical leave; 5) 42 U.S.C. §1983 to redress violations of the First Amendment by those acting under color of law brought against Defendant Folberg in his personal capacity except for prospective prohibitory injunctive relief (including, but not limited to, reinstatement) sought against Defendant Folberg in his official capacity; 6) 42 U.S.C. §1983 to redress due process violations of the Fourteenth Amendment by those acting under color of law to Dr. Maes' reputation and employment opportunities (stigma plus) brought against Defendant Folberg in his personal capacity and in his official capacity for prospective injunctive relief; and 7) 42 U.S.C. §1983 to redress violations of the Fourth Amendment regarding the seizure of Dr. Maes computer on June 5, 2006 brought against Defendant Folberg in his personal capacity only.

**ANSWER:**

Denies the allegations except as hereafter admitted.  Admits Plaintiff purports to bring an action under the FMLA, 29 U.S.C. § 2611 *et seq.,* 42 U.S.C. § 1983 (to redress alleged violations of the First [against Defendant Folberg in his personal capacity except for prospective prohibitory injunctive relief (including, but not limited to, reinstatement) sought against Dr. Folberg in his official capacity], Fourth [allegedly regarding the seizure of Dr. Maes' computer on June 5, 2006 brought against Dr. Folberg in his personal capacity only], and Fourteenth [allegedly to redress due process violations of the Fourteenth Amendment by those acting under color of law to Dr. Maes' reputation and employment opportunities (stigma plus) brought against Dr. Folberg in his personal capacity and in his official capacity for prospective injunctive relief] Amendments by those acting under color of law), 5 ILCS § 430/15-5 *et seq.* against both Defendant Folberg and Defendant Board, and under Illinois State law allegedly for tortious interference with prospective economic opportunity against Dr. Folberg in his personal capacity only, and allegedly for defamation against Dr. Folberg in his personal capacity only.

3.     Much of the focus in this lawsuit concerns allegations that Defendants have engaged in a pattern of behavior to punish Plaintiff for reporting violations of federal law and regulations to the FDA and participating in the FDA's investigation which included attempts to correct violations of federal law and regulations in the University of Illinois at Chicago Medical Center's Blood Bank, which included violations that impacted patient care and safety.

**ANSWER:**

Denies the allegations of paragraph 3.

4.     Plaintiff seeks mandatory and prohibitory injunctive relief including, but not limited to, reinstatement to her prior positions, injunctive relief to require Defendants to cease and desist from abusive, unlawful treatment of whistleblowers by top officials at the University of Illinois at Chicago Medical Center ("UIC Medical Center"); and damages, including, but not

limited to, backpay, an award of compensatory damages, other make whole and statutory relief, against one or both Defendants depending on the claims and punitive damages against Defendant Folberg only.

**ANSWER:**

Denies the allegations except as hereafter admitted. Admits Plaintiff purports to bring an action seeking legal and equitable relief.

## II.     Jurisdiction and Venue.

5.     This Court has jurisdiction of the Illinois State Officials and Employees Ethics Act whistleblower violations pursuant to 745 ILCS §5/1; over the tortuous interference with economic opportunity and defamation claims pursuant to the Illinois Supreme Court's decisions in *Jinkins v. Lee*, 209 Ill.2d 320 (2004) and *Fritz v. Johnson*, 209 Ill.2d 302 (2004); over the FMLA claim pursuant to 29 U.S.C. §2617(a)(2) and 745 ILCS §5/1.5 and over the three 42 U.S.C. §1983 claims (First Amendment, Fourth Amendment and Fourteenth Amendment substantive due process provisions) due to its power as a court of general jurisdiction.

**ANSWER:**

This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, § 1343(3) and (4) and 42 U.S.C. § 2000e-5(f)(3). Supplemental jurisdiction is conferred by 28 U.S.C. § 1367 for Plaintiff's state law causes of action, although the Court should decline to exercise supplemental jurisdiction over Count I for the reasons stated in Defendants' Motion to Dismiss.

6.     Venue is appropriate in this Court pursuant to 735 ILCS §5/2-103 (a) because the unlawful employment and constitutional practices and acts alleged herein were committed within Cook County, Illinois.

**ANSWER:**

Denies the allegations except as hereafter admitted. Admit venue is appropriate in this Court.

## III.     Parties

7.     Plaintiff Lou Ann (Lanne) Maes ("Dr. Maes") is a licensed physician and a citizen of the United States and a resident of the State of Illinois and Lake County, Illinois. Dr. Maes has been certified by the American Board of Pathology in Clinical Pathology and Transfusion Medicine. She came to the UIC Medical Center as Visiting Director of Clinical Pathology in April, 2004. In February-March, 2005, she became Director of Transfusion Medicine and Interim Director of Clinical Microbiology. In August, 2005, she became Director of Clinical Pathology following her promotion to Associate Professor in the College of Medicine. She retained the positions of Director of Clinical Pathology and Director of Transfusion Medicine until Defendant Robert Folberg with the assistance of other employees of Defendant Board of Trustees began retaliating against her in October, 2005 for having made disclosures regarding violations of FDA regulations that adversely affect patient care and standards applicable to

Blood Bank and Donor Room and participating in investigations to attempt to correct those violations. At the present time, she remains an associate professor in the UIC College of Medicine.

**ANSWER:**

Denies the allegations except as hereafter admitted. Admits Dr. Maes is a licensed physician and a citizen of the United States and a resident of the State of Illinois and Lake County, Illinois; that Dr. Maes has been certified by the American Board of Pathology in Clinical Pathology and Transfusion Medicine; that she came to the University as Visiting Associate Professor of Pathology (Clinical non-tenured basis) in the College of Medicine and on a one-year contract as Visiting Director of the Division of Clinical Pathology in the Hospital at the University. Admits further that in or about February 2005, Dr. Maes became Interim Director of Blood Bank/Transfusion Medicine. Admits that when Dr. Paul Schreckenberger resigned as Director of Microbiology until late January 2006, Dr. Maes was allowed to assume the title of Interim Director of Microbiology until the Department of Pathology either conducted a search and recruited an external candidate, or appointed the internal candidate, Dr. William Janda, to the position of Director. Dr. Janda was associate director of Clinical Microbiology at the time. Admits further that Dr. Maes retained the position of Director of the Division of Clinical Pathology until November 3, 2005, when she voluntarily relinquished the position of Director of the Division of Clinical Pathology to become Director of the Laboratory Utilization Project, although retaining the position of Interim Director of Blood Bank/Transfusion Medicine until spring 2006 when her duties were assumed by Dr. Chejfec. Admits that on June 5, 2006, all clinical duties in the Department of Pathology of the Medical Center were removed from Dr. Maes and that her employment relationship with the Medical Center ended on August 15, 2006 when her contract with the Medical Center was not renewed. Admits further that at the present time, Dr. Maes is an associate professor in the UIC College of Medicine on a 51% Q-contract, a non-tenured, but tenure-track position, which ends August 15, 2008.

8.      Defendant Robert Folberg ("Defendant Folberg") is a licensed physician who is certified in anatomic pathology and ophthalmology. He has been the chair of the Pathology Department at the UIC Medical Center and a Professor in the College of Medicine since 2000. At all times relevant hereto, Dr. Folberg was Dr. Maes' supervisor and empowered to remove her from her positions in the Pathology Department at the UIC Medical Center. At all times relevant hereto, Dr. Folberg had ultimate supervisory authority over the Blood Bank and other clinical laboratories at the UIC Medical Center. He is sued in his personal capacity for all causes of action and, pursuant to 745 ILCS §§5/1 and 1.5, in his official capacity for Counts I and IV.

**ANSWER:**

Denies the allegations, except as hereafter admitted. Admits that Dr. Folberg is a licensed physician who is certified in anatomic pathology and ophthalmology; that he has been the Head of the Pathology Department at the UIC Medical Center and a Professor in the College of Medicine since 2000; and that he also holds the position and responsibilities delegated to him as "Chief of Service" for Pathology at the UIC Hospital. Further denies that Plaintiff is suing Dr. Folberg in his personal capacity for all causes of action, as Count IV specifically states it is only

brought against the Defendant Board.  Admits Plaintiff purports to sue Dr. Folberg in his official capacity for Counts I and VI, not IV (sic).

9.     Defendant Board of Trustees of the University of Illinois ("Defendant Trustees") is a body politic and corporate pursuant to 110 ILCS §305/1, which operating under additional statutory provisions pursuant to 110 ILCS §305/1, has the ultimate responsibility to operate and administer the University of Illinois, including the University of Illinois College of Medicine and the University of Illinois at Chicago ("UIC") Medical Center.  Defendant Trustees are sued in their official capacity for violations of 5 ILCS 430/15-5 *et seq.*  (Count I) and violations of the FMLA (Count IV) pursuant to 745 ILCS §§5/1 and 1.5.

**ANSWER:**

Denies the allegations, except as hereafter admitted.  Admits Defendant Board of Trustees of the University of Illinois ("Defendant Board") is "a body politic and corporate," (110 ILCS 310/1) operating under, among other statutory provisions, 110 ILCS 305/1, with ultimate responsibility to operate and administer the University of Illinois, including the University of Illinois College of Medicine and Medical Center.  Admits Plaintiff purports to sue Defendant Board in its official capacity for violations of the FMLA (Count IV) and 5 ILCS 430/15-5 *et seq.* (Count I).

**IV.    Common Statement of Facts**

10.     The UIC Illinois Medical Center is a teaching hospital that is affiliated with the College of Medicine at UIC.  Both the Medical Center and the College of Medicine as a matter of state law are ultimately directed and controlled by Defendant Trustees.  However, Defendant Trustees, through the lack of day to day involvement and development and implementation of a real system of oversight, have ceded their responsibility to ensure patient safety and quality care of patients and to protect whistleblowers and those employees who exercise their First Amendment rights to call attention to wrongdoing to Chief Medical Officer William Chamberlin (also Associate Dean of the College of Medicine), Dr. Joseph Flaherty, Dean of the College of Medicine and the hospital administrator, John DeNardo, CEO of Healthcare Systems.

**ANSWER:**

Denies the allegations except as hereafter admitted.  Admits the allegations of the first two sentences, except to state that the correct name is the University of Illinois Medical Center at Chicago.

11.     In order to be certified to provide health care and to offer certain medical treatments, the UIC Medical Center must submit to various inspections and maintain accreditations or certifications from various governmental and quasi-governmental agencies, including the Food and Drug Administration ("FDA"), a federal agency, the Joint Commission on Accreditation of Healthcare Organizations ("JCAHO"), the College of American Pathologists ("CAP") and the American Association of Blood Banks ("AABB").

**ANSWER:**

Denies the allegations except as hereafter admitted.  Admits that as part of its operation the UIC Medical Center must submit to various inspections and maintain accreditations or certifications from various governmental and quasi-governmental agencies, including the Food and Drug Administration ("FDA"), a federal agency, the Joint Commission on Accreditation of Healthcare Organizations ("JCAHO") and the College of American Pathologists ("CAP") and the American Association of Blood Banks ("AABB").

12.    Among the responsibilities of the Director of Transfusion Medicine and indirectly, the Director of Clinical Pathology and the Chair of the Pathology Department are to ensure the safe and effective operation of the UIC Medical Center Blood Bank, which is comprised of the Hospital Blood Bank, the Blood Bank Donor Room ("BBDR") and the Blood Bank Hemotherapy Center ("BBHC").  The principal duty of the BBDR is the safe collection of whole blood and blood components (e.g. platelets, white or red cells) from donors.

**ANSWER:**

Denies the allegations except as hereafter admitted.  Admits that among the responsibilities of the Director of Transfusion Medicine and the Director of Clinical Pathology and the Head of the Pathology Department is to ensure the safe and effective operation of the UIC Medical Center Transfusion Medicine service, which encompasses the Blood Bank and the Hemotherapy Center.  Admits the Transfusion Medicine service also involves clinical activities such as aphaeresis, which is conducted in the Hemotherapy Center, and that the Blood Bank is comprised of the Blood Bank Donor Room ("BBDR"), the Hospital Blood Bank and the Blood Bank Hemotherapy Center ("BBHC").  Admits further that a principal responsibility of the BBDR is the safe collection of whole blood and blood components (e.g. platelets, white or red cells) from donors.

13.    The principal functions of the UIC Medical Center Blood Bank are the safe storage of blood products that have been collected from donors, accurate labeling and processing of blood products that have been collected, testing of blood products to assure that they may be provided to patients in need so that the patients receive safe and appropriate medical care and are not harmed by being given blood products that have not been properly collected, processed, stored or tested.

**ANSWER:**

Denies the allegations except as hereafter admitted.  Admits that among the principal functions of the University of Illinois Medical Center at Chicago Blood Bank are the safe storage of blood products that have been collected from donors, accurate labeling of blood products that have been collected, testing of blood products to assure that they may be provided to patients in need so that the patients receive safe and appropriate medical care and are not harmed by being given blood products that have not been properly stored or tested.

14.    The principal functions of the BBHC at the UIC Medical Center involve the use of blood and blood products for treatment of ill patients through transfusion of donor blood

products, referred to as therapeutic apheresis, to replace diseased blood or blood products (e.g. replacing sickled red cells with healthy ones) and less often providing essential blood components that the patient lacks.

**ANSWER:**

Denies the allegations except as hereafter admitted. Admits that among the principal functions of the BBHC at the University of Illinois Medical Center at Chicago involve the use of blood and blood products for treatment of ill patients through transfusion of donor blood products, referred to as therapeutic aphaeresis, to replace diseased blood or blood products (e.g. replacing sickled red cells with healthy ones), and less often, providing essential blood component that the patient lacks.

15.    BBDR collections, the Blood Bank testing and storage operations and the functioning of the BBHC are intensively regulated by the FDA and JACHO and monitored by the AABB and CAP to ensure safe patient care and the prevention of harm to donors and potential recipients of the blood products collected. Such regulation requires a comprehensive process of documentation and development of procedures and monitoring, including, but not limited to, the development of training regimens, standard operating procedures (SOP's), regimens for equipment, laboratory, environmental, processing and blood product quality control, protocols for screening donors, collecting and testing blood, storage and notification to donors and recipients of positive infectious disease test results or other issues affecting patient safety.

**ANSWER:**

Denies the allegations except as hereafter admitted. Admits that BBDR collections, the Blood Bank testing and storage operations, and the functioning of the BBHC are intensively regulated by the FDA and monitored by the AABB, CAP and JACHO to ensure safe patient care and the prevention of harm to donors and potential recipients of the blood products collected in accordance with their regulations and other requirements.

16.    Prior to becoming employed at the UIC Medical Center, Dr. Maes had been on the faculty at the University of Arkansas for Medical Sciences and the Medical University of South Carolina. She had prior positions as the Director of Clinical Laboratory medical Student and Resident Training, Assistant Medical Director, Clinical Laboratories and Medical Director, Transfusion Medicine at the Medical University of South Carolina. She also was the Medical Director, Transfusion Medicine, Hematology and Chemistry, and Medical Director, Apheresis and Stem Cell Transplant at the Arkansas Children's Hospital. She also was Medical Director, Clinical Microbiology at the Arkansas University Hospital.

**ANSWER:**

Except as hereafter stated on information and belief, states that he is without knowledge or information to form a belief as to the truth of these allegations. States that on information and belief from information provided by Dr. Maes and other sources that those allegations are true.

17.     From April 1, 2005 until June 5, 2006 Dr. Maes was the Director of Transfusion Medicine at the UIC Medical Center.  She remained the Director of Clinical Pathology until the latter part of November, 2005, when she was forced to resign by Defendant Folberg.

**ANSWER:**

Denies the allegations except as hereafter admitted.  Admits that in or around February 2005, she became Interim Director of Blood Bank/Transfusion Medicine at the University of Illinois Medical Center at Chicago.  Admits further that on November 3, 2005, she voluntarily relinquished the position of Director of the Division of Clinical Pathology and agreed to assume the offered new position of Director of the Laboratory Utilization Project.

18.     Until October, 2005, Dr. Maes encountered no adverse treatment as either a director at UIC Medical Center or a faculty member at the College of Medicine.  In fact, she was highly regarded as a teacher (in both the Colleges of Medicine and Dentistry), doctor and colleague.  On May 18, 2005, UIC Medical Center Chief Medical Officer Dr. Chamberlin, wrote to Defendant Folberg about how "brilliant" she was in convincing the Urologists to develop a regimen of competency training.  He congratulated Defendant Folberg on "a fine choice for Director of Clinical Labs." [Email from Dr. Chamberlin to Defendant Folberg, attached hereto as Exhibit A].  On May 22, 2005, Defendant Folberg informed Dr. Maes that he was completing his portion of her promotion materials that would cause her to be made an Associate Professor at the College of Medicine in a tenure track position.  That promotion was made effective in August, 2005.

**ANSWER:**

Denies the allegations except as hereafter admitted, and states that she was reprimanded for being late in turning in her promotions packet and she was reprimanded for failing to keep an appointment to have Dr. Folberg assist her with the preparation of a manuscript.  Admits that on May 18, 2005, University of Illinois Medical Center at Chicago Chief Medical Officer Dr. Chamberlin sent an e-mail to Dr. Folberg, a copy of which is attached to the Complaint as Exhibit A, which document speaks for itself.  Admits that in May 2005 Dr. Folberg wrote a summary in Dr. Maes' promotions packet in support of her transition from Visiting Associate Professor to Associate Professor on a Q-contract.  That three-year Q-contract was issued in August 2005 and the conditions therein speak for themselves.

19.     In late July, 2005, an employee of the Blood Donor Center submitted an email resignation in which she made misconduct allegations against the Associate Director of the Blood Bank and the BBHC, Steven Sosler and also asserted that there had been serious problems in the operation of the Blood Bank until Dr. Maes had taken over, including the allegation that SOP's the employee written had been ignored, the Blood Bank was backward in its implementation of certain procedures, products were being transfused in an improper manner and various documents were falsified in preparation for inspections by one or more of the governmental or quasi-governmental entities listed above.

**ANSWER:**

Denies the allegations except as hereafter admitted.  Admits Dr. Maes replaced the complained about Associate Director of the Blood Bank and the BBHC at the beginning of February 2005.  Admits that on July 20, 2005, an employee (Heather Johnson) submitted her notice of resignation in an e-mail in which she complained about several things directed at the Human Resources Department and some of her co-workers.  That e-mail speaks for itself.  The employee has since recanted under oath and admitted that she had no basis for claiming any misconduct by Steven Sosler.  The same employee has since admitted that she had been advising Dr. Maes of these problems in the Blood Bank for months.  Dr. Maes failed to take required steps to correct the problems when Ms. Johnson originally raised them with her, and Dr. Maes failed to follow required reporting procedures with respect to many of those issues.

20.    Dr. Maes immediately began to investigate the employee's allegations and learned about the following violations of FDA regulations contained in 21 C.F.R. Parts 211 and 606:

      a.    Platelet donor procedure files had been falsified by the previous Director of Transfusion Medicine and other doctors and that Sosler allegedly had aided in the falsification of these records, which created a risk of harm to the donor in future donations and an unsafe product that could be given to recipients;

      b.    Quality control was not being consistently performed for several key tests and existing quality control records for instruments, tests, reagents and temperature readings had been either altered or falsified, which could result in false data on donors and risk that blood products used to treat patients were not safe; and

      c.    New BBHC employees were not given training prior to assuming duties and competency evaluations were not administered to existing employees.

**ANSWER:**

Denies the allegations except as hereafter admitted.  Admits that as the Interim Director of the Blood Bank/Transfusion Medicine and Director of the Department of Clinical Pathology, it was Dr. Maes' duty to investigate all issues related to Transfusion Medicine/Blood Bank operations, but she did not start to do so until Ms. Johnson's July 20, 2005 e-mail.  After that e-mail was brought to the University of Illinois Medical Center at Chicago Executives' attention, they formed a group for Dr. Maes to work in conjunction with others in the Department of Pathology to investigate and respond appropriately to address any problems found to exist. Admits Dr. Maes ultimately claimed that she believed subparts a, b and c to have occurred. Admits further that Dr. Maes represented to the UIC administration and the FDA she had determined that no unusual complications during donations had been observed, that no products were compromised, and that Dr. Maes had determined that no harm had been done to any patient from any such actions.

21.     Dr. Maes immediately took action through appropriate channels to cause the Blood Donor Center to be closed that same day until the Center's procedures could be assessed and a determination made about these assertions.  Within the next few days, Donor Room employees confirmed the validity of these assertions.

**ANSWER:**

Denies the allegations except as hereafter admitted.  Admits that in response to the complaints about lack of procedures brought to the attention of Dr. Folberg, Dr. Carson, and Dr. Chamberlin, an investigation was conducted by the Department of Pathology in which Dr. Maes was involved.  Admits further that upon the recommendation of Dr. Maes, University of Illinois Medical Center at Chicago closed the Blood Donor Center for a period of time, and it was not re-opened until Dr. Maes had first advised the UIC Medical Center Administration, and later advised the FDA on September 1, 2005, that "she re-opened the donor program after she verified that all safeguards and procedures that she put into place ensured the products safety, purity, or potency."

22.     Dr. Maes conducted an intensive investigation of the UIC BBDR from July 26 to September 1, 2005 and uncovered a number of additional violations of federal FDA regulations, including violations of 21 C.F.R. Part 1271in that:

    a.     Blood donor records lacked required information or the information was altered or filled in after the donation and indeed after the product had been transfused and such records, when accurate, often indicated that donations from a particular donor should have been deferred due to medical history, testing results or lack thereof, travel history, no record of consent for the donation; the records lacked important requirements for authorization to donate or a means of recognizing and resolving conflicting information; and the records did not contain the identity of the person who performed donor screening, all of which put into jeopardy the safety of the blood supply being collected;

    b.     Blood collection was improper in that the donor was not being properly identified; donor blood was collected into improperly labeled tubes and collection bags and labels were not appropriately affixed to the donor file so that when testing for infectious diseases and for Rh is conducted, it can be traced to the specific donor and the product that was donated and when positive results are obtained, the donor can be notified;

    c.     Certification of cardiopulmonary resuscitation ("CPR") for Donor room employees was missing, which raised a concern about the preparedness of such employees in the event of a CPR emergency;

    d.     Required FDA physician reviews of the platelet and stem cell donor files was missing, which could put the donor at risk in future donations and also create a risk that an unsafe product had been donated; and

      e.    Documentation was missing that donors had been notified promptly if a donation was deferred due to positive infectious disease testing and that recipients had been notified of having received a potentially unsafe product.

**ANSWER:**

Denies the allegations except as hereafter admitted.  Admits that as the Interim Director of the Blood Bank/Transfusion Medicine and Director of the Department of Clinical Pathology it was Dr. Maes' duty to investigate all issues related to Transfusion Medicine/Blood Bank operations, and that she investigated the issues in conjunction with others in the Department of Pathology and University of Illinois Medical Center at Chicago.  Admits that the FDA made observations after its inspection noting some of these subparts, almost all of which were cited for events occurring after Dr. Maes had assumed direct responsibility for the Blood Bank in early February 2005, and long after she first assumed indirect responsibility as Director of Clinical Pathology in March 2004 to prevent, uncover and correct problems, so that the disclosures of any such deficiencies demonstrated her inadequacy in her positions.  One of the specific assignments she had been given when originally hired was to use her Blood Bank expertise to investigate, oversee, improve and ensure compliance with all applicable requirements of the operation of the transfusion medicine services of the UIC Blood Bank.  Admits further that in response to the complaints about lack of procedures, Ms. Johnson was requested to and agreed to work on assisting Dr. Maes in rewriting standard operation procedures under Dr. Maes' direction.

23.    During the investigation, Dr. Maes also uncovered violations of federal Medicaid/Medicare regulations, which she communicated to Defendant Folberg along with the FDA violations described above.  These violations concerned falsifications of records and a large number of missing records regarding the treatment of patients by doctors in the Transfusion Medicine Service.  Despite the inadequate and/or missing records, physician services had been billed to Medicare/Medicaid and other heath care insurers.

**ANSWER:**

Denies the allegations, except as hereafter admitted.  Admits that in late September 2005 Dr. Maes voiced her suspicions that she suspected that the former director, before leaving at the end of February 2005, had submitted some bills for which backup records could not be located.  Admits that the University promptly commenced an investigation of her suspicions.

24.    During the time period of her investigation, she began a process of identifying and correcting these violations but Sosler resisted making the necessary changes.

**ANSWER:**

Denies the allegations except as hereafter admitted.  Admits that after she voiced her suspicions about certain issues she was encouraged to gather the facts to support her position and to take all appropriate corrective action.  She had been directly responsible to prevent, uncover and take appropriate corrective actions if problems were discovered since she became Interim Director of the Blood Bank in or about February 2005, and many of the events observed by the

FDA occurred after February 2005.

25.    On or about September 1, 2005, Dr. Maes notified the FDA of the results of her investigation to date and that she had voluntarily closed the BBDR.

**ANSWER:**

Denies except as hereafter admitted.  Admits that on September 1, 2005, in the presence of Gil Salas and Peter Gashkoff, Dr. Maes called Sharon O'Callahan CBER requesting guidance in completing the Biological Product Deviation Report ("BPDR").  She advised the FDA representative that "she re-opened the donor program after she verified that all safeguards and procedures that she put into place ensured the products safety, purity, or potency."

26.    On or about September 21, 2005, the FDA began a routine inspection of the UIC Blood Bank, the BBDR and the BBHC.  Although at first the FDA personnel said that they anticipated that the inspection would last a few days, once they were informed that Dr. Maes had already self-reported serious violations to the central headquarters of the FDA, the investigators decided to conduct a more extensive investigation that continued into the first week of October. During this inspection, FDA inspectors also noted that temperature logs were not completed satisfactorily, the centrifuge was dirty, certain documentation was kept inconsistently, improper maintenance records and other improper record-keeping and problems in the content of various SOP's.

**ANSWER:**

Denies the allegations except as hereafter admitted.  Admits that the FDA appeared for a Level II abbreviated inspection, but went into a Level I inspection because of the alleged document irregularities that had been self-reported.  Admits that Dr. Maes, in her capacity as Interim Director of Blood Bank/Transfusion Medicine and Director of Clinical Pathology, responded to questions and raised certain issues with the FDA, none of which were believed by her to be injurious to patients.  Admits Dr. Maes had on September 1, 2005, orally raised some issues with the FDA before the inspection, for which UIC was going to submit BPDRs, and which Dr. Maes was working on at the time with others from the University of Illinois Medical Center at Chicago.  Admits further that the FDA issued a Form FDA 483 that listed seven observations, all of which related to issues that were in existence or occurred after Dr. Maes became Interim Director of Transfusion Medicine in February 2005.  Admits further that the FDA issued an establishment inspection report on March 14, 2006, which mentions the seven observations. That report states that Dr. Maes advised the FDA that "they determined that no products were compromised . . . , Dr. Maes said that management has been very supportive of her efforts encouraging her to do whatever is necessary to correct the problems in the blood bank donor center."

27.    FDA inspectors did not close the Blood Bank, the BBDR and BBHC because Dr. Maes had self-reported violations and they were confident in her ability and dedication to correcting violations and ensuring that they would not re-occur.  During the course of her participation with FDA inspectors in the inspection to identify and determine how to correct the violations with the FDA inspectors during the period of the inspection, Dr. Maes voiced concerns

about the Sosler's role in the above-described deficiencies and questioned his ability and commitment to operate these entities in a lawful and medically safe manner.

**ANSWER:**

Denies the allegations except as hereafter admitted. Admits that the FDA did not close the Blood Bank during the inspection. Admits that Dr. Maes acted unreasonably and in violation of proper and legitimate performance of her duties and reporting responsibilities, by giving her opinion to one of the FDA inspectors about Steven Sosler. Dr. Maes later admitted she knew it was wrong to have done so.

28.      On or about October 26, 2005, Dr. Maes attended an FDA Summation Meeting with Defendant Folberg and others. At the meeting, Defendant Folberg interrogated her about her communications with the FDA, specifically about her comments about Sosler and ordered her not to have further communications with the FDA without his approval. On several occasions after that, he reiterated that she was not allowed to contact an outside agency without his approval.

**ANSWER:**

Denies the allegations except as hereafter admitted. Admits that Dr. Maes attended a meeting with Dr. Folberg, Dr. Carson and Pramod Mehotra on October 26, 2005, at which Dr. Maes' meeting notes reflect she told an FDA official her opinions of Steven Sosler's performance as a manager and admitted it was improper for her to have done so. Admits further that at that meeting, Dr. Folberg told Dr. Maes to promptly raise her opinions and concerns about the blood bank with him, or Drs. Carson or Chejfec before communicating about those opinions and concerns with an outside agency and to have a witness present when communicating with an outside agency, as she was acting on behalf of the University in her capacities as Interim Director of Transfusion Medicine/Blood Bank and Director of Clinical Pathology.

29.      On or about November 2, 2005 at an FDA Follow-up meeting, Defendant Folberg berated Dr. Maes about her "behavior" with the FDA and indicated he wanted her to resign as Director of Clinical Pathology. Dr. Maes resisted in the face of continued and strident demands by Defendant Folberg.

**ANSWER:**

Denies except as hereafter admitted. Admits the following: in a meeting on November 2, 2005, attended by Drs. Folberg and Carson and Pramod Mehotra, Dr. Folberg told Dr. Maes that he had been thinking about what her particular skills were and what would be best for her career, and that he was concerned she had not been publishing anything. He said one of her best skills was her ability to work with other clinicians, and Dr. Chamberlin wanted her for the new job of Director of the Pathology Laboratory Utilization Committee, reporting directly to Dr. Chamberlin. Dr. Folberg told her that this is an important job with a high profile in the University. On November 3, 2005, she accepted the proposal to relinquish the Director of Clinical Pathology. She did so with considerable enthusiasm, volunteering that this was clearly in her own best interest. She also subsequently described her enthusiasm for her new position to

a number of people present at a staff retreat. She was to remain as interim director of the blood bank while a replacement was sought and while she completed the BPDR and response to Form FDA 483.

30.    Dr. Maes continued to take action to correct the problems with the Blood Bank, the BBDR and BBHC but was confronted with the failures of Defendant Folberg to allow needed staff to be hired and the unwillingness of Sosler to participate in the needed changes. On or about November 21, 2005 as part of a continuing course of action to remove Dr. Maes from her position as Director of Clinical Pathology, Defendant Folberg called her at home and insisted that she resign as Director of Clinical Pathology. Feeling that she had no choice and under great pressure from Defendant Folberg, she wrote a resignation email to him, using language he had instructed her to use. He immediately communicated her resignation to the staff.

**ANSWER:**

Denies except as hereafter admitted. Admits Dr. Maes sent an e-mail on November 21, 2005, following up on her previous oral acceptance and oral voluntary resignation as Director of Clinical Pathology to assume the other offered position responsibilities after a brief continuing period as Interim Director of Transfusion Medicine.

31.    Dr. Maes notified Dean Flaherty about her forced resignation and complained to the UIC Office of Access and Equity, claiming that she had been retaliated against for making complaints about violations of FDA and Medicaid/Medicare regulations. Access and Equity is an office that is supposed to assist whistleblowers and victims of discrimination at UIC. However, it does not do so except in a perfunctory manner. At times, if acts to assist those at UIC who retaliate against whistleblowers and persons who have alleged discrimination.

**ANSWER:**

Denies except as hereafter admitted. Admits that Dr. Maes sent a grievance letter to Dr. Folberg dated December 15, 2005, which letter speaks for itself. Admits further that the UIC Office of Access and Equity found her allegations without merit.

32.    At a mediation set up by Office and Equity, Defendant Folberg was allowed to engage in verbal attacks against Dr. Maes. She indicated that she had continued to confer with the FDA about the issues concerning violations of federal regulations and the problems she was encountering in trying to remedy them. He refused to return her to her position in that mediation or at any other time. He also reiterated that she should not contact outside agencies, including the FDA. The mediators took no action against Defendant Folberg nor did they recommend that UIC do so.

**ANSWER:**

Denies except as hereafter admitted. Admits that the UIC Office of Access and Equity conducted mediation. During the mediation both sides under the confidential mediation procedures discussed their relative positions. Admits further that the mediation ended unsuccessfully.

33.    On or about December 9, 2005, Dr. Maes informed Dr. James Carson, Administrative Director of the Department of Pathology and someone who reported directly to Defendant Folberg, that there had been no Quality assurance/Quality Control meeting to assess whether changes in the Donor Room had solved the problems. Dr. Maes had continually sought to have such meetings since October, 2005 but was thwarted in those efforts by Sosler and Defendant Folberg. Due to ongoing concerns about continuing violations that affected donor and patient safety, she indicated that she would not sign the FDA BB/DR registration and other documents for the FDA until she was confident that issues were being resolved.

**ANSWER:**

Denies except as hereafter admitted. Admits that Dr. James Carson, Administrative Director of the Department of Pathology, reported to Dr. Folberg, in his capacity as "Chief of Service" for Pathology at the UIC Hospital, as to some administrative functions.

34.    During the period from December, 2005 through May, 2006, Dr. Maes attempts to correct the deficiencies in the Blood Bank, BBDR and BBHC were undermined by Sosler and Dr. Greg Chejfec, the Interim Director of Clinical Pathology.

**ANSWER:**

Denies the allegations of paragraph 34.

35.    As part of her obligations to engage in research, Dr. Maes had been collaborating with Dr. Larry Ulanski, an ophthalmologist, on a clinical study with Occulogix, a company that has designed a device that assists in cleaning the blood of patients. In early January, she was not invited to a meeting convened by Defendant Folberg even though she was a Co-Investigator. In a discussion after that meeting, Defendant Folberg stated his intention of removing Dr. Maes as Co-Investigator and then acted to remove her at a later time period.

**ANSWER:**

Denies except as hereafter admitted. Admits Dr. Maes was removed from any participation in the Occulogix project at the request of Dr. Ulanski.

36.    Issues with respect to the Occulogix study arose due to staffing shortages caused by Defendant Folberg's failure to process the needed new hire approval. During a week in which Occulogix sent a trainer to train staff to conduct the research study, patients whom were ill, were not given prompt treatment due to the staffing shortages caused by Defendant Folberg. Dr. Maes reported these issues to Occulogix and was criticized for doing so by Defendant Folberg. The failings of Defendant Folberg and his decision to remove Dr. Maes from her position as Co-Investigator of this study jeopardized important research for the UIC Medical Center as well as patient safety.

**ANSWER:**

Denies except as hereafter admitted. Admits the Occulogix project was lost because of

the inappropriate behavior by Dr. Maes relative to the Occulogix study demonstrating that she mismanaged the department and placed her personal interests over the interest of patients and the University.

37.     In late January and April, 2006, a Quality Inspection of the Blood Bank and related entities was conducted by Patrick Ooley, an independent expert hired by UIC for the purpose of helping the UIC Medical Center respond to the FDA notification of violations. Defendant Folberg attempted to control Dr. Maes' access to Mr. Ooley during this period although prior to his visit, she sent him documentation of the violations she and the FDA had found.  In one of several meetings that she was allowed to attend, she discussed falsification of records with him and that most, if not all, blood products collected by the BBDR to date and transfused to patients or stored in the Blood Bank were of questionable safety due to the numerous violations of FDA regulations.  Dr. Maes was not allowed to attend the final summation meeting with Mr. Ooley or to see his final report which Defendants are attempting to keep confidential.

**ANSWER:**

Denies the allegations except as hereafter admitted.  Admits that Patrick Ooley, an independent consultant, was retained by the University to, among other things, evaluate the transfusion medicine service including Dr. Maes' performance, and investigate the alleged problems in the Blood Bank suggested by Dr. Maes.  This included various issues Dr. Maes raised with him.  Admit further that the final report by Mr. Ooley was not shown to Dr. Maes and that she did not attend his summation meeting on his report.

38.     On information and belief, Mr. Ooley's final report is consistent with Dr. Maes findings of violations of federal regulations and supports her efforts to correct the problems that led to these violations and indicates that persons, whom Mr. Ooley interviewed, told him that Dr. Maes was the primary person concerned about patient care and safety.

**ANSWER:**

Denies the allegations except as hereafter admitted.  Admits that some blood donor room personnel may have stated to Mr. Ooley words suggesting that Dr. Maes was concerned about patient safety and care.

39.     On March 10, 2006, Dr. Maes attempted to attend an emergency meeting of the BBDR staff called by Defendant Folberg but when she arrived, she was excluded by him even though she was still serving as Director of the BBDR at that time.

**ANSWER:**

Denies the allegations except as admitted.  Admits that she was not permitted to be present during a town hall meeting with Blood Bank staff held on March 10, 2006.

40.     Dr. Maes alerted Dr. Chamberlin and Dean Flaherty to the adverse employment decisions being taken against her as described above in ¶28-30, 35-7, 39 by Defendant Folberg

as a result of her complaints about violations of federal regulations and the obstacles she was encountering in correcting these deficiencies but they did nothing to intervene to stop the retaliatory conduct. On information and belief, they acted to support the retaliation and did not act to ensure that FDA and Medicaid/Medicare violations were being corrected so that blood donors and patients would receive quality care and not be subjected to unsafe practices. [February 25, 2006 Letter from Dr. Maes to Dr. Chamberlin and Dean Flaherty, attached hereto as Exhibit B].

**ANSWER:**

Denies the allegations except as hereafter admitted. Admits that the February 25, 2006 letter attached to the complaint as Exhibit B was sent by Dr. Maes, which letter speaks for itself, and which allegations in the letter are denied.

41.     On May 1, 2006, Dr. Maes came down with a serious, life-threatening eye disease. She was hospitalized and treated with antibiotics. She was off work until June 5, 2006 due to this serious condition. During this time, Defendant Folberg's office had her complete necessary paperwork to have this leave treated as a medical leave under the FMLA and the leave was approved.

**ANSWER:**

Denies the allegations except as hereafter admitted. Admit that on May 2, 2006, UIC received notice that Dr. Maes was admitted to Lake Forest Hospital for an eye disease, that she returned to work June 5, 2006, and that she had submitted paperwork requesting and was granted FMLA leave for the period.

42.     When Dr. Maes first reported back to work from her FMLA medical leave on June 5, 2006, she was not given an opportunity to get medical clearance from the appropriate UIC Medical Center staff but instead, at the direction of Defendant Folberg, was informed she had to meet immediately with Dr. Carson and Dr. Chejfec at which time she was given two letters from Defendant Folberg. One informed her that she was being terminated from her position at the UIC Medical Center and that her last day in the position would be August 15, 2006.

**ANSWER:**

Denies the allegations except as hereafter admitted. Admits that on June 5, 2006 she was advised to promptly meet with Drs. Carson and Chejfec upon her return, at which time she was handed two letters, which letters speak for themselves.

43.     The second letter stated that "[e]ffective immediately and extending through August 15, 2006, she would not have any clinical responsibilities in the Department of Pathology. and you are reassigned to non-clinical academic duties. It further provided that she was not to "visit the blood bank, the donor center, or any area engaged in the clinical operation of the Department of Pathology." She was reassigned to a new office and told to immediately give the laptop computer, provided to all UIC College of Medicine to the Department of

Pathology so that a copy of the hard drive could be made, even though, under the terms of these letters, she remained a faculty member in the College of Medicine. Finally, she was told to focus her efforts on her position as pathology liaison with the College of Dentistry and collaborations with a member of that college, Dr. Joel Schwartz.

**ANSWER:**

Denies the allegations except as hereafter admitted. Admits that she did receive a letter on June 5, 2006, which letter speaks for itself.

44.     Dr. Maes informed Dr. Carson that the laptop computer was at home and that she would bring it in the next day and he indicated his agreement. She was then informed that she had to immediately clear out her office and later Dr. Carson, acting at the direction of Dr. Folberg, had her belongings searched in her office with the door open.

**ANSWER:**

Denies except as hereafter admitted. Admits that when Dr. Maes advised them that the University's laptop computer was at home that she was provided a ride to retrieve it by campus security and that another employee accompanied them. Admits that Dr. Maes' office was being relocated, and she was permitted to identify which things in her office were "personal effects," to be moved to her new office.

45.     Dr. Carson, acting under the direction of Defendant Folberg, then told her to go with UIC police, who due to a call made to them prior to her meeting with Dr. Carson and Dr. Chejfec were already waiting for her to drive her home immediately to retrieve the laptop computer and bring her back to the UIC Medical Center. Dr. Maes believed that she had no choice but to go with the police officers in a car to her residence. She was humiliated by having her belongings searched and in being taken into custody and driven to her home as if she was a common criminal. On June, 5, 2006, she was in the custody of the UIC police for several hours at the direction of Defendant Folberg. Her laptop computer was seized without probable cause and a copy of the hard drive was made without probable cause or any legitimate basis. These actions were undertaken in order to further Defendant Folberg's retaliatory motives. In all these actions, she was treated adversely and differently than UIC faculty members who do not report violations of law and regulations.

**ANSWER:**

Denies the allegations except as hereafter admitted. Admits that she was driven home to retrieve the University's laptop computer by UIC police acting as campus security in an unmarked campus vehicle. Admits that upon her return, the hard drive of the University's laptop computer was imaged (copied) and returned to her.

46.     In removing Dr. Maes from all clinical pathology areas of the UIC Medical Center including the Blood Bank, Defendant Folberg and the UIC Medical Center violated JCAHO rules requiring specific processes for the transfer of patients from one doctor to another in order to assure a continuum of quality care. Defendant Folberg also failed to take appropriate

steps to ensure that residents and interns received appropriate supervision in the care of patients in the Blood Bank, BBDR and BBHC.

**ANSWER:**

Denies the allegations of paragraph 46.

47.    Dr. Maes wrote Dr. Chamberlin and Dean Flaherty regarding the incidents of June 5 but they did not respond or take appropriate action to correct Defendant Folberg's unlawful actions and to ensure patient safety and quality medical care at the Blood Bank.  [June 5, 2006 Letter to both of them, attached hereto as Exhibit C].  She also wrote to Defendant Folberg that the restriction of her access to the UIC Medical Center compromised or prevented the completion of outside grant clinical trials and the completion of clinically-based articles that she had been collaborating on with other doctors and being able to attend continuing medical education seminars in her field of expertise.  [June 12, 2006 Letter to Defendant Folberg attached hereto as Exhibit D].

**ANSWER:**

Denies the allegations except as hereafter admitted.  Admits that Dr. Maes sent letters, copies of which are attached to the Complaint as Exhibits C and D, both of which letters speak for themselves.

48.    At the time of her removal from clinical duties at the UIC Medical Center, Defendants were in the process of responding to the FDA violations in a manner that did not fully acknowledge wrongdoing or what was needed to prevent future violations and which Defendant Folberg and those working with him knew that Dr. Maes would not accept.

**ANSWER:**

Denies the allegations except as hereafter admitted.  Admits that as of June 6, 2006, Mr. Ooley had taken over responsibility for and had almost finalized the BPDR because Dr. Maes had been unable to complete the BPDR for over ten months, even though it was supposed to have been filed no later than 45 days after she first became aware of the subject matter of the BPDR.

49.    Thereafter, Dr. Maes contacted Dr. Schwartz, her liaison at the College of Dentistry to discuss the pathology course they were to teach at the College of Dentistry.  He also discussed with her the possibilities of her collaborating with him on his research.

**ANSWER:**

Denies the allegations except as hereafter admitted.  Admits that Dr. Schwartz and Dr. Maes were in discussions about her assisting with a pathology course in the College of Dentistry and her possible role in his research project.

50.    As a result of these discussions and Dr. Maes' initial research collaborations Dr. Schwartz, she was informed in writing in June, 2006 that the Dental School was going to hire her in late August to perform research with Dr. Schwartz.

**ANSWER:**

Denies the allegations of paragraph 50, except as hereafter admitted.  Admits that Dr. Schwartz was attempting to find a way that Dr. Maes could help him on a research project and sent an e-mail to Dr. Maes saying the Dean of the College of Dentistry had agreed, when in fact the Dean had not yet agreed to his proposal.

51.    In order to facilitate her employment with the College of Dentistry, she had to communicate with Pramod Mehrotra, the business manager of the Pathology Department, because after August 15, 2006, she was still listed as a full-time employee.

**ANSWER:**

Denies the allegations of paragraph 51.

52.    Shortly after that communication, Mr. Mehrotra, acting under the direction of his boss, Defendant Folberg, contacted the Dean of the College of Dentistry in order to pressure him to cancel the agreement to hire her.  Mr. Mehotra told the Dean that Dr. Maes was a "troublemaker." There were further malicious and false communications from or caused by Defendant Folberg with the Dean of the College of Dentistry in order to get the Dean to rescind the offer to Dr. Maes as part of a campaign of retaliation and other malicious conduct against her.  Defendant Folberg ultimately was successful in doing so and on or about September 8, 2006, the offer was withdrawn.

**ANSWER:**

Denies the allegations of paragraph 52.

53.    Nevertheless Dr. Schwartz still needed Dr. Maes' collaboration to complete his research, which would result in improving the knowledge base for development and treatment of oral cancer and in bringing outside grant money to the UIC Medical Center.  Dr. Maes agreed to continue collaborate on Dr. Schwartz's research without pay, but again due to the intervention of Defendant Folberg, she was not allowed to do so.  Defendant Folberg also has acted to restrict Dr. Maes' access to her research start-up funds that she was attempting to use in her collaboration with Dr. Schwartz.

**ANSWER:**

Denies the allegations of paragraph 53 except as hereafter admitted.  Admits Dr. Schwartz still wanted Dr. Maes' assistance on a research project and she told him she would do the work as a volunteer.  Admits the Dental School would not allow her to do work in the College of Dentistry as a volunteer.

54.     Dr. Maes was scheduled to teach the pathology class in the College of Dentistry during fall semester as referred to in Defendant Folberg's June 5, 2006 letter to her (Ex. E) but after October, 2006 she was excluded from teaching through the intervention of Dr. Folberg. She also was removed as the Co-Director and teacher of a pathology class in the College of Dentistry for the winter semester in 2006-07 through his intervention. She also has been removed from teaching pathology in the College of Medicine.

**ANSWER:**

Denies the allegations of paragraph 54 except as hereafter admitted. Admits as a result of Dr. Folberg writing Dr. Schwartz on June 16, 2006, stating: *"Dear Joel, As I explained earlier by phone, Dr. Utset plans to leave academic medicine in August 2006, Dr. Maes had assisted you with the course before Dr. Utset's arrival and I thought that it would be appropriate for her to resume this role. I hope this works out for all parties . . . ,"* Dr. Maes was scheduled to teach some pathology courses in the Dental School in the fall term. Admit further that Dr. Sara Gordon was hired in the Dental School as a new faculty member with a joint appointment (Oral Pathology and Pathologist), and that Dr. Gordon took over the role of coordinating pathology courses in the College of Dentistry that members of the Department of Pathology in the College of Medicine had previously coordinated. Since then, no one from the Department of Pathology in the College of Medicine was needed to coordinate those courses; no co-director position existed after Dr. Gordon began teaching in the College of Dentistry.

55.     In the fall of 2006, Defendant Folberg falsely, maliciously, wantonly, willfully and in bad faith informed the Dean of the Dental School that Dr. Maes had committed plagiarism with respect to distributing assigned reading to the medical students she was teaching in November, 2005. This communication was concealed from Dr. Maes and she had no way of learning that it had occurred until August, 2007. In fact, Dr. Maes had not committed plagiarism. The incident which Defendant Folberg seized upon over six months after it had occurred to turn it into this false and malicious charge had been well known to the Pathology Department course director at the time it occurred. The course director had determined at the time of the incident that any suggestion of Dr. Maes' wrongdoing was improper. No administrative processes, which were supposed to be initiated when such an allegation was believed to have merit, were initiated. Nothing more was made out of it until Defendant Folberg desired to use it as part of his retaliatory campaign against Dr. Maes for her reporting of violations of law and participation in investigations to identify and correct those violations. After this incident and the course director's determination that Dr. Maes had not committed plagiarism or any misconduct, she continued to teach thereafter through the spring semester.[1] On information and belief, Defendant Folberg has since November 21, 2007, made or caused to be made this same and other false and malicious accusation in a wanton and willful manner to decision-makers within the College of Medicine who are considering a tenure decision regarding

---

[1]     There are other serious incidents in which Defendant Folberg has acted dishonestly and in bad faith, maliciously, wantonly and willfully in taking actions that have and will seriously jeopardize and/or destroy Dr. Maes career as a physician but documents regarding these incidents have been designated as confidential pursuant to a protective order in the federal case. As soon as a protective order is entered in this case, Dr. Maes intends to contest the confidentiality of the facts related to these incidents and then will seek to amend her complaint.

Dr. Maes and outside of the College in a manner than has caused and will continue to cause great harm to Dr. Maes' career in academic medicine.

**ANSWER:**

Denies the allegations except as hereafter admitted. Admits that on October 24, 2006, Dr. Folberg met with Dean Graham at Dr. Maes' request in an attempt to convince Dean Graham to reverse his decision that Dr. Maes could not do research in the Dental School with Dr. Schwartz. Admits that in their brief meeting, Dean Graham specifically asked Dr. Folberg why she was not teaching in the College of Medicine, and Dr. Folberg said she had poor student evaluations and she had prepared lecture handouts that were given to the students without any attribution to the source. Denies specifically that Dr. Folberg used the word "plagiarism" to Dean Graham, and that Dr. Folberg mentioned the handouts incident to anyone else outside the College of Medicine, and that Dr. Folberg made any statements, oral or written, to the Department's Tenure Committee about the handouts incident or to anyone on the College's Tenure Committee about Dr. Maes' academic misconduct involving the handouts other than the required submission. Admits further that as part of his required submission on Dr. Maes' tenure application, Dr. Folberg responded to Dr. Maes' submission, which Dr. Maes had captioned "Response to Allegations of Plagiarism", which document speaks for itself and does not state that Dr. Maes' conduct involving the handouts was plagiarism.

56.    Defendant Folberg has engaged in the actions described in ¶55 and other actions as part of an overall plan and practice to remove her from various positions within the UIC Medical Center, terminate her employment at the UIC Medical Center, prevent her employment with the College of Dentistry; prevent her from being able to teach at the UIC Colleges of Medicine and Dentistry, take away research opportunities, deny her tenure and terminate her employment at the College of Medicine and prevent her from obtaining any future employment as a doctor or as an academic in retaliation for the reporting of serious violations of federal law and regulations, some of which adversely affected patient care and safety. This plan and practice described herein is ongoing.

**ANSWER:**

Denies the allegations of paragraph 56.

57.    In September, 2006, AABB representatives inspected the UIC Medical Center Blood Bank. On information and belief, they found serious problems that posed potential life-threatening patient harm in the areas that Dr. Maes had been attempting to correct but could not due to Defendant Folberg's resistance.

**ANSWER:**

Denies the allegations of paragraph 57, except as hereafter admitted. Admits that in September 2006, AABB representatives inspected the UIC Medical Center Blood Bank.

58.    Prior to coming to UIC and since she has been there, Dr. Maes has been active in the AABB and has given several presentations at the Annual Convention, including serving as

Director and Moderator of "Ask the Experts" since 2004. She is a co-author of the recently published *Practical Guide to Transfusion Medicine*, *2nd Edition* (AABB, 2007), one of the only two textbooks recommended for the teaching of Transfusion Medicine to health professionals, medical students, residents and fellows. She is a director on the board of the American Society for Apheresis. She has also served on the Transfusion Medicine Advisory Committee for the American Society of Clinical Pathologists. She has made numerous scientific and clinical presentations at meetings of these and other medical organizations.

**ANSWER:**

Deny the allegations of paragraph 58 except as hereafter admitted. Admits Dr. Maes has been a director of the AABB and has served as a co-chair for sessions presentations and has made academic presentations at that organization's annual meetings. Admits she is a identified as one of the co-authors of the recently published *Practical Guide to Transfusion Medicine*, *2nd Edition* (AABB, 2007) by virtue of her revision of one of the chapters in the 1st edition of the book that had previously been written by one of the other co-authors, Gary Stack. States that he is without information or belief to form a belief as to the truth of whether Dr. Maes is active on the Board of the American Society of Aphaeresis and on committees for the American Society of Clinical Pathologists.

59.     Dr. Maes' removal from her position as Director of Clinical Pathology through her forced resignation as described in ¶¶29-30, her removal as ordered by Defendant Folberg, from the Occulogix study as described in ¶¶35-6, from all clinical activities in Pathology as described in ¶¶43-6, the actions of Defendant Folberg and others at UIC in preventing her from being hired at the College of Dentistry and from conducting research and teaching there and her removal as an instructor in the pathology course at the College of Dentistry and at the College of Medicine and the pattern of actions by Defendants described in ¶¶55-6 above has damaged her academic career in terms of obtaining tenure and her research career in terms of grants and publications.

**ANSWER:**

Denies the allegations of paragraph 59.

60.     The above-described actions of Defendant Folberg, whether undertaken solely by himself or in concert with others, has caused Dr. Maes to suffer emotional distress and humiliation.

**ANSWER:**

Denies the allegations of paragraph 60.

61.     At all times relevant hereto, Defendant Folberg and those acting under his direction or in concert with him in undertaking the actions described in ¶¶ 17-59 were acting under color of state law but outside the scope of his authority in that his actions toward Dr. Maes and in attempting to cover-up the FDA violations found by her were malicious, wrongful and

inconsistent with state and federal law and the purposes for which the UIC Medical Center exists.

**ANSWER:**

States that these allegations are legal conclusions to which no response is required, and to the extent an answer is required, they are denied.

**V.     Claims for Relief**

**Count I** (Illinois Law Claim Pursuant to 5 ILCS §430/15-5 *et seq* Against Defendants Folberg and Board of Trustees re-filed from federal lawsuit)

**Dr. Folberg and Defendant Board have moved to dismiss Count I in its entirety so no answer is required.  To the extent an answer is required, all allegations are denied.**

**Count II** (common law tortious interference with economic opportunity claim against Defendant Folberg only not previously filed)

**Dr. Folberg has moved to dismiss Count II in its entirety so no answer is required. To the extent an answer is required, all allegations are denied.**

**Count III** (common law defamation claim against Defendant Folberg only not previously filed)

**Dr. Folberg has moved to dismiss Count III in its entirety so no answer is required. To the extent an answer is required, all allegations are denied.**

**Count IV** (Previously Filed FMLA Claim of Denial of Return to Position After Approved Medical Leave against Defendant Board of Trustees only)

**This Count is not brought against Dr. Folberg so no answer is required.  To the extent an answer is required, all allegations are denied.**

**Count V** (Previously Filed Section 1983 Claim Against Defendant Folberg only for Infringement on Dr. Maes First Amendment Rights)

1.-61.  Dr. Maes realleges and incorporates paragraphs 1.-61. as Paragraphs 1.-61. of Count V of her Complaint.

**ANSWER:**

Dr. Folberg realleges and incorporates paragraphs 1-61 as Paragraphs 1-61 of Count V of his Answer.

81.     The First Amendment of the United States Constitution protects the rights of citizens, including state employees to exercise their right to speak out about matters of public concern.

**ANSWER:**

       States that these allege legal conclusions to which no response is required, and to the extent an answer is required, they are denied as to this Plaintiff as to the circumstances alleged.

       82.    Such protected rights of free speech encompass complaints about wrongdoing at a state hospital and the violation of federal regulations and rules of hospital accreditation agencies that seek to protect patient's safety and ensure that hospitals and medical professionals provide quality medical care.

**ANSWER:**

       States that these allege legal conclusions to which no response is required, and to the extent an answer is required, they are denied as to this Plaintiff as to the circumstances alleged.

       83.    Plaintiff Maes, as an academic and treating physician, has specialized knowledge and insight that make her views about violations of regulations that affect patient safety and the quality of care particularly well-informed.  It is vitally important that public agencies be able to hear those viewpoints.

**ANSWER:**

       Denies the allegations of paragraph 83.

       84.    In communicating about the FDA violations, the cause of those violations and problems in remedying them to the FDA and Mr. Ooley as described in ¶¶20-7, 33, 35-6, 37, 40, Dr. Maes was speaking not only as Director of Clinical Pathology and Transfusion medicine but also as a citizen, physician and academic in making sure that violations of federal law that undermined patient safety and the quality of care were addressed.

**ANSWER:**

       Denies the allegations except as hereafter admitted.  Admits that to the extent she made statements to the FDA and Mr. Ooley she was not speaking as a citizen, but was speaking as an employee of the University and in performance of her job duties.

       85.    As described above, Defendant Folberg consistently made clear to Dr. Maes that her job duties did not include communicating with outside agencies about matters of public concern like violations that affected patient safety and the quality of care.  Her job description does not include the reporting of violations to governmental agencies, included not limited, to the FDA.

**ANSWER:**

       Denies the allegations of paragraph 85.

86.     Defendant Board of Trustees and high level personal at the UIC Medical Center and the College of Medicine in the past have acted to punish persons who have exercised their First Amendment rights to speak out about issues affecting patient safety and the quality of care at the UIC Medical Center in a manner that makes clear that it is not within a physician or other medical professional's job description to engage in such speech.  On information and belief UIC attorneys and the Office of Access and Equity enable UIC Medical Center and College of Dentistry officials to silence whistleblowers and those exercising their First Amendment rights by not preventing unwarranted disciplinary action.

**ANSWER:**

Denies the allegations of paragraph 86.

87.     When Defendant Folberg engaged in the retaliatory actions described above (¶¶29-30, 35-6, 42-5, 47, 51-6), there were clearly established principles of First Amendment case law rendering such conduct unconstitutional.  As such, Defendant Folberg's conduct was not objectively reasonable.

**ANSWER:**

Denies the allegations of paragraph 87.

88.     Defendant Folberg lacked any adequate justification for retaliating against Dr. Maes for the exercise of her right of free speech by forcing her to resign as Director of Clinical Pathology, removing her as Co-Investigator from the Occulogix study, canceling her appointment as Director of Transfusion Medicine, causing her to be placed under the custody of UIC police, causing her employment with the College of Dentistry to be cancelled, causing her to be denied to conduct research at the College of Dentistry without pay and causing her to be removed as a teacher of the pathology course in the College of Dentistry and College of Medicine as described above.

**ANSWER:**

Denies the allegations of paragraph 88.

89.     As a result of Defendant Folberg's retaliatory actions against Dr. Maes, she has suffered lost back pay and emotional distress and humiliation and her career as an academic, physician and researcher has been harmed, entitling her to an award of compensatory damages against Defendant Folberg.

**ANSWER:**

Denies the allegations of paragraph 89.

90.     Defendant Folberg's actions as described above were undertaken intentionally and in reckless disregard for Dr. Maes' First Amendment rights.  In order to deter future misconduct, Dr. Maes is entitled to an award of punitive damages.

**ANSWER:**

Denies the allegations of paragraph 90.

91.     The ongoing pattern of retaliatory conduct by Defendant Folberg has caused Dr. Maes irreparable harm for which there is no adequate remedy at law.  Consequently she seeks a prohibitory, prospective injunction against Dr. Folberg in his official capacity to seek and desist such retaliatory conduct and a mandatory prospective injunction against Defendant Folberg in his official capacity to reinstate Dr. Maes to her positions as Director of Clinical Pathology and Director of Transfusion Medicine.

**ANSWER:**

Denies the allegations of paragraph 91.  Further, denies that Plaintiff is entitled to any relief whatsoever.

**Count VI** (Section 1983 Fourteenth Amendment Due Process Stigma Plus Claim against Defendant Folberg in his personal and official capacity not previously filed)

**Dr. Folberg has moved to dismiss Count VI in its entirety so no answer is required. To the extent an answer is required, all allegations are denied.**

**Count VII** (Section 1983 Fourth Amendment Claim against Defendant Folberg only)

**Dr. Folberg has moved to dismiss Count VII in its entirety so no answer is required. To the extent an answer is required, all allegations are denied.**

**VIII.     Prayer For Relief**

**Defendant denies that Plaintiff is entitled to any relief whatsoever.**

WHEREFORE Plaintiff prays that this Court:

A.     Order that Defendant Trustees reinstate Dr. Maes to her positions as Director of Clinical Pathology and Director of Transfusion Medicine, to remove any record of her removal as Director of Transfusion Medicine or her appointment at the UIC Medical Center and to remove any record of her having committed plagiarism.

**Defendant denies that Plaintiff is entitled to any relief whatsoever.**

A.     Order Defendants Trustees and Folberg to make Dr. Maes whole by giving her back pay (doubled pursuant to Counts I and IV), lost fringe and pension benefits with prejudgment interest, and compensating her for the damage to her career as an academic, physician and researcher pension.

**Defendant denies that Plaintiff is entitled to any relief whatsoever.**

B.      Grant Dr. Maes an award of compensatory damages on Counts I, II, III and V, VI and VIII against Defendant Folberg and against Defendant Board of Trustees on Counts I and IV for the emotional harm and humiliation she suffered as a result of the acts complained of above..

**Defendant denies that Plaintiff is entitled to any relief whatsoever.**

C.      Permanently enjoin Defendants from retaliating against whistleblowers like Dr. Maes.

**Defendant denies that Plaintiff is entitled to any relief whatsoever.**

D.      Grant Plaintiff a judgment for punitive damages against Defendant Folberg on Counts I, II, III, V, VI and VII in an amount sufficient to deter him.

**Defendant denies that Plaintiff is entitled to any relief whatsoever.**

E.[sic] Grant Plaintiff reasonable attorneys fees, costs and fees for experts on Counts I, IV, V, VI and VII and reasonable costs on Counts II and III.

**Defendant denies that Plaintiff is entitled to any relief whatsoever.**

F.      Grant Plaintiff such other relief as this Court deems necessary and proper.

**Defendant denies that Plaintiff is entitled to any relief whatsoever.**

## AFFIRMATIVE DEFENSES

1.      There is no individual liability under the Whistleblower provisions of the State Officials and Employees Ethics Act, and the claims against Dr. Folberg in his personal capacity under the Act should be dismissed.

2.      Dr. Folberg is entitled to absolute privilege and/or public official immunity for his complained-of actions in Counts II and III, and those counts should be dismissed.

3.      Alternatively, Dr. Folberg is entitled to qualified privilege under Counts II and III.

4.      Alternatively, to the extent Plaintiff alleges *per se* defamation or tortious interference under Counts II and III, Dr. Folberg was acting within the scope of his employment when responding to questions about Dr. Maes' academic misconduct and/or responding to Dr. Maes' false and misleading explanation of her handout incident to the College's Promotion and Tenure committee, which Dr. Maes first raised in the tenure process.

5.      Alternatively, to the extent Plaintiff alleges *per quod* defamation against Dr. Folberg she has failed to state a claim for relief, as Dr. Folberg was acting within the scope of his employment when responding to questions about Dr. Maes academic misconduct and/or responding to Dr. Maes' false and misleading explanation of her handout incident to the College's Promotion and Tenure committee, which Dr. Maes first raised in the tenure process.

6.    Dr. Folberg's actions complained of in Counts II and III do not state a claim because Plaintiff did commit plagiarism, and any statements Dr. Folberg made to anyone about Dr. Maes with respect to her academic misconduct in creating handouts by copying e-Medicine articles verbatim without attribution which she caused to be handed out to and posted for UIC Medical students were and are true.

7.    Alternatively, Dr. Folberg's allegedly defamatory comments do not form the basis of a claim because, among other reasons, Dr. Folberg's alleged comments were opinions.

8.    Alternatively, Defendants are entitled to state law sovereign immunity on the claims of defamation and tortious interference pursuant to the Illinois State Lawsuit Immunity Act, 745 ILCS 5/1, and the Court of Claims Act 705 ILCS 505/1 *et seq.*, including the limits on damages in 705 ILCS 505/8.

9.    Alternatively, Plaintiff has failed to state a claim for relief under the Whistleblower provisions of the State Officials and Employees Ethics Act, but in any event, even if Plaintiff established that her reporting to a public body or a supervisor was a contributing factor to any complained of actions, which is denied, all actions taken against Plaintiff about which she complains would have happened anyway.

10.    Alternatively, Plaintiff may not recover compensatory or punitive damages under the Whistleblower provisions of the State Officials and Employees Ethics Act.

11.    Alternatively, Plaintiff has failed to state a claim for relief under the Whistleblower provisions of the State Officials and Employees Ethics Act for failure to renew her appointment in the UIC Medical Center.

12.    Plaintiff may not recover punitive damages in this action because Defendants acted with good faith and did not engage in any action with malice or with reckless indifference to any of Plaintiff's federally-protected or state-protected rights.

13.    Plaintiff has failed to state a cause of action against either Defendant for punitive damages under any of the Counts.

14.    Plaintiff has failed to state a cause of action against Defendant Dr. Folberg under the First or Fourth Amendment because he is entitled to qualified immunity.

15.    Plaintiff has failed to state a cause of action against Defendant Dr. Folberg under the due process provisions of the Fourteenth Amendment for Stigma Plus because he is entitled to qualified immunity.

16.    Plaintiff has not alleged any search of the University owned laptop computer was conducted, let alone an unlawful one.  Alternatively, Plaintiff consented to the seizure and she had no expectation of privacy in her laptop computer because she was subject to policies of the UIC Medical Center concerning its computer resources, which includes use of laptop computers and its network access, which expressly disavow that any user of the computer resources has any expectation of privacy and a search of the computer resources is expressly provided for in the applicable policies.

17.     Plaintiff has failed to allege an unlawful seizure of the University owned laptop computer in her possession.

18.     By virtue of the circumstances and her position with the UIC Medical Center, Plaintiff did not speak out on a matter of public concern because it was her duty to handle the dealings and communications with outside regulatory and other agencies, including the FDA, with respect to the UIC Blood Bank and laboratories, which she managed.  As such, she acted within and pursuant to her duties as an employee, and not as a public citizen when communicating with outside agencies.

19.     By virtue of the circumstances, Plaintiff's speech was not constitutionally protected, including that she acted unreasonably.

20.     Assuming arguendo that Plaintiff spoke out on a matter of public concern, which Defendants deny under the *Pickering* balancing test, Defendant Folberg was justified in his actions.

21.     Plaintiff was not demoted or terminated as a result of protected speech.

22.     Any actions taken with respect to Plaintiff would have occurred regardless of whether she was on FMLA leave.

23.     Actions taken against Plaintiff were for legitimate business-related reasons unrelated to her FMLA leave or any constitutionally or statutorily protected activity by Plaintiff, if any.

24.     To the extent that Plaintiff establishes liability, Plaintiff failed to mitigate her damages.

25.     The claims against Dr. Folberg in his official capacity are redundant with the claims against the University and should be dismissed.

26.     To the extent that any act or omission taken by Defendant with respect to Plaintiff violated the FMLA, such act or omission was in good faith and Plaintiff may not recover liquidated damages.

27.     A jury trial is not available for one or more of Plaintiff's claims.

28.     Plaintiff has failed to state claims on which relief can be granted.

29.     Plaintiff has failed to state a claim for emotional harm or compensatory damages in Count IV under the FMLA.

30.     Plaintiff is not entitled to damages under Section 1983 for Counts V, VI and VII against Defendant Board or against Dr. Folberg in his official capacity.

31.     Plaintiff has failed to state a cause of action against Defendant Board for damages under Counts V, VI, and VII because it is immune from damages under the Eleventh

Amendment.

WHEREFORE, Defendant respectfully prays that Plaintiff take nothing by the Complaint, that the Complaint be dismissed with prejudice, and that Defendants be awarded their costs and reasonable attorneys' fees incurred in defending against this action and such other relief as the Court deems just and proper.

Respectfully submitted,

**ROBERT FOLBERG, M.D.**

By:  s/ Mark E. Furlane

One of His Attorneys
Mark E. Furlane, Esq. (ARDC #00897175)
Noreen H. Cull, Esq. (ARDC # 06229417)
DRINKER BIDDLE GARDNER CARTON
191 North Wacker Drive, Suite 3700
Chicago, Illinois 60606-1698
Telephone:  (312) 569-1000
Fax:  (312) 569-3000
E-mail:  mark.furlane@dbr.com
E-mail:  noreen.cull@dbr.com

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned attorney certifies that on January 3, 2008, he caused a copy of the foregoing **DEFENDANT ROBERT FOLBERG'S ANSWER AND AFFIRMATIVE DEFENSES TO PLAINTIFF'S COMPLAINT FOR MANDATORY AND PROHIBITORY INJUNCTION AND FOR ACTUAL, COMPENSATORY AND PUNITIVE DAMAGES**, to be served by electronically filing it with the Clerk of the Court, which will send notification of such filing to the following:

Steven Saltzman
122 South Michigan Avenue
Suite 1850
Chicago, Illinois 60603
Email: <u>Saltzcases@gmail.com</u>

By: s/ Mark E. Furlane
Mark E. Furlane, Esq. (ARDC #00897175)
DRINKER BIDDLE GARDNER CARTON
191 North Wacker Drive, Suite 3700
Chicago, Illinois 60606-1698
Telephone: (312) 569-1000
Fax: (312) 569-3000
E-mail: <u>mark.furlane@dbr.com</u>

CH01/ 12526028.4